T.C. Memo. 2008-268

UNITED STATES TAX COURT

JANUARY TRANSPORT, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 14484-06.                    Filed December 3, 2008.

Jon H. Trudgeon, for petitioner.

William F. Castor, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, Judge:  Respondent issued a notice of deficiency
with respect to petitioner's 2002 Federal income tax.  Respondent
determined that petitioner was liable for an $18,035 accuracy-
related penalty under section 6662(a).[1]  The only issue for

---

[1]Unless otherwise indicated, all section references are to
                                        (continued...)

decision is whether petitioner is liable for the accuracy-related penalty as determined by respondent.

FINDINGS OF FACT

Some of the facts have been stipulated. We incorporate the stipulated facts into our findings by this reference. When the petition was filed, petitioner was an Oklahoma corporation with its principal place of business in Oklahoma.

I. Background

A. Petitioner's Business

Petitioner began operations as an unincorporated business in 1952. It incorporated sometime between 1983 and 1986. Petitioner is a trucking company that handles hazardous and nonhazardous waste. It removes waste from oil and water separators at its clients' tire and lube locations and transports the waste to one of the recycling facilities owned by January Environmental Services, Inc. (JES), a related corporation.

Chris Allen January (Mr. January) started working for petitioner in 1976 after graduating from high school. He became petitioner's president when it incorporated. During 2002 Mr. January was petitioner's president, and he owned 80 percent of

---

[1](...continued)
the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts are rounded to the nearest dollar.

petitioner's stock.  During 2002 Mr. January's sister, Carol January (Ms. January),[2] also worked for petitioner.

B.    Petitioner's Bookkeeping, Financial Statements, and Return Preparation

In about 1984 petitioner retained Stone & Koskie, CPAs, P.C. (Stone & Koskie), to provide accounting and tax preparation services.  In 1992 Jenyle Koskie (Ms. Koskie), a certified public accountant (C.P.A.), joined Stone & Koskie as a partner.  On the date of trial Ms. Koskie owned a 75-percent interest in Stone & Koskie.

One of the services Stone & Koskie provided to petitioner was data entry into petitioner's computerized books of account. Stone & Koskie entered such information as receipts, expenses, bank statements, and relevant transactions, including asset purchases.  Stone & Koskie then produced financial statements using the computerized information.  Before March 2002 Steve Jansing (Mr. Jansing), a Stone & Koskie employee, was involved in data entry for petitioner.  Ms. Koskie was responsible for reviewing petitioner's financial statements and preparing its final books and tax returns.  Ms. Koskie also prepared tax returns for JES, Mr. January and his wife, and their children, if necessary.

---

[2]During the relevant period Ms. January also used the last names Reavis and Flowers.

Approximately once a month Ms. January brought petitioner's records to Stone & Koskie's office. Often information was incomplete, and either Mr. Jansing or Ms. Koskie telephoned Ms. January with questions or requested additional information, such as copies of receipts for major purchases. If Ms. January could not answer a question, Ms. Koskie would ask Mr. January.

In March 2002 in addition to performing her own duties, Ms. Koskie assumed Mr. Jansing's duties until a new employee could be hired.[3]

## II. Sale of the Rockwell and Purchase of a Cessna Airplane

### A. Sale of the Rockwell

In 2000 petitioner acquired a one-third interest in a 1976 Rockwell airplane (Rockwell) subject to a loan. On March 31, 2002, petitioner signed over its interest in the Rockwell to the remaining two owners, who assumed petitioner's obligation on the loan. When the sale occurred, petitioner's general ledger showed that petitioner's share of the outstanding loan was $213,901.[4]

### B. Enactment of the Job Creation Act

On March 9, 2002, the Job Creation and Worker Assistance Act of 2002 (Job Creation Act), Pub. L. 107-147, 116 Stat. 21 (codified as amended in scattered sections of U.S.C.), was signed

---

[3]Mr. Jansing was diagnosed with a terminal illness and could no longer perform his duties.

[4]Respondent subsequently determined the balance of petitioner's note payable was $227,054.

into law.  As part of the Job Creation Act, Congress enacted

section 168(k) to allow an additional first-year depreciation

deduction equal to 30 percent of the adjusted basis of qualified

property (bonus depreciation).  Job Creation Act sec. 101(a), 116

Stat. 22.  The Job Creation Act generally defined qualified

property as property that met all of the following requirements:

(1) The property was modified accelerated recovery system (MACRS)

property with an applicable recovery period of 20 years or less,

unless it was certain computer software, water utility property,

or qualified leasehold improvement property; (2) the original

use[5] of the property commenced with the taxpayer after September

10, 2001; (3) the taxpayer acquired the property within a

specified period; and (4) the taxpayer placed the property in

service before specified dates.  Id.  The bonus depreciation

provision was effective for property placed in service after

---

[5]The legislative history of the Job Creation and Worker
Assistance Act of 2002, Pub. L. 107-147, 116 Stat. 21, explains
that original use means the first use to which the property is
put.  See S. Prt. 107-49, at 5 n.7 (2001), 2002-3 C.B. 180, 186;
H. Rept. 107-251, at 20 n.2 (2001), 2002-3 C.B. 44, 63.  The
General Explanation of Tax Legislation Enacted in the 107th
Congress published on Jan. 24, 2003, states that sec. 1.48-2,
Income Tax Regs., applies for evaluating whether property
qualifies as original-use property.  Staff of Joint Comm. on
Taxation, General Explanation of Tax Legislation Enacted in the
107th Congress (general explanation), at 218-219 n.208 (J. Comm.
Print 2003), 2002-3 C.B. 263, 275-276.  The general explanation
contains an example involving the purchase of a used asset by a
taxpayer and states that no part of the purchase price qualifies
for bonus depreciation.  Id.

September 10, 2001, in taxable years ending after such date.  Id. sec. 101(b), 116 Stat. 25.

C.    Purchase of the Cessna

On April 24, 2002, petitioner bought a used Cessna Citation 50 airplane (Cessna) from an unrelated party.  Around the time of the purchase, Mr. January obtained a two-page article titled "30% Immediate Bonus Depreciation for New and Used Aircraft Approved by House Ways and Means Committee" (article).  The article was subtitled "Anticipated Passage into Law within Two Weeks".  The article was ostensibly written by a C.P.A. and was dated October 14, 2001.

The article stated that the House of Representatives Committee on Ways and Means had passed H.R. 3090, 107th Cong., 1st Sess. (2001) (bill), which would have allowed bonus depreciation for the year in which the taxpayer placed qualified property in service.[6]  The article noted that "Qualified property [included] new and used aircraft acquired after September 10, 2001, and before September 11, 2003."[7]  The first paragraph of

---

[6]The article referred to H.R. 3090, 107th Cong., 1st Sess. (2001) (bill) (enacted), introduced in the House of Representatives and referred to the Committee on Ways and Means on Oct. 11, 2001.  147 Cong. Rec. 19426 (2001).  As of the date of the article, the Committee on Ways and Means had not yet reported the bill.  H. Rept. 107-251, supra at 1, 2002-3 C.B. at 44 (reporting the bill on Oct. 17, 2001).

[7]The bill as introduced defined qualified property as inter alia, original use property only.  See H.R. 3090, sec. 101(a) (as (continued...)

the article stated that "Although this is far from complete, this is a very substantial first step toward this significant legislation."  Mr. January read the article and understood that the legislation was not complete and that the article described a possible tax benefit consisting of an additional 30-percent depreciation deduction for airplanes.

In 2002, around the time of the Cessna purchase, Mr. January initiated a conversation with Ms. Koskie regarding bonus depreciation for the Cessna.  During the conversation Ms. Koskie told Mr. January that her understanding was that bonus depreciation could be claimed only with respect to new (original-use) assets.  Mr. January stated he had read an article about an exception for used airplanes and subsequently sent it to Ms. Koskie.  Mr. January told Ms. Koskie that he would like to claim bonus depreciation.  Although they knew the Cessna was a used airplane, Mr. January and Ms. Koskie decided to claim bonus

---

[7](...continued)
introduced in the House of Representatives, Oct. 11, 2001).  The original use requirement remained in all versions of the bill that provided for bonus depreciation.  See H.R. 3090, sec. 101(a) (as concurred in by the Senate, Mar. 8, 2002); H.R. 3090, sec. 101(a), 148 Cong. Rec. 2715, 2736 (2002) (as agreed and passed by the House of Representatives, Mar. 7, 2002); H.R. 3090, sec. 201(a) (as reported by the S. Comm. on Fin., Nov. 9, 2001); H.R. 3090, sec. 101(a), 147 Cong. Rec. 20479, 20526 (2001) (as passed by the House of Representatives, Oct. 24, 2001); H.R. 3090, sec. 101(a), H. Rept. 107-251, supra at 4, 2002-3 C.B. at 47 (as reported by H.R. Comm. on Ways and Means, Oct. 17, 2001); H.R. 3090, sec. 101(a) (as introduced in the House of Representatives, Oct. 11, 2001).

depreciation on petitioner's financial statements.  Neither Mr. January nor any other employee of petitioner had further conversations with Ms. Koskie regarding the article.

III. <u>Preparation of Petitioner's 2002 Financial Statements and Return</u>

Stone & Koskie received petitioner's records for April 2002, the month when petitioner purchased the Cessna, but because of the busy tax season, Ms. Koskie did not prepare petitioner's financial statements until approximately a month later.  On October 21, 2002, Stone & Koskie prepared a set of adjusting journal entries for April 2002.  An adjusting entry recorded the monthly depreciation of $117,195, which included fractional bonus depreciation for the Cessna.

On February 20, 2003, Stone & Koskie prepared a final internal depreciation schedule that Ms. Koskie used to prepare petitioner's 2002 Form 1120, U.S. Corporation Income Tax Return (2002 return).  The final depreciation schedule reflected bonus depreciation claimed for the Cessna and other assets.[8]  On May 16, 2003, Ms. Koskie prepared 2002 yearend adjustments but did not correct the erroneously claimed bonus depreciation.[9]

---

[8]Besides the Cessna, in 2002 petitioner purchased other used and new (original-use) assets.

[9]If any depreciation deductions were erroneously claimed during the year, Ms. Koskie would normally correct the error through yearend adjustments to petitioner's depreciation account "Accumulated Depreciation".

Ms. Koskie subsequently prepared petitioner's 2002 return on the basis of the financial statements. Petitioner's 2002 return claimed a depreciation deduction of $586,803 including bonus depreciation of $298,413, of which $225,000 related to the Cessna. Petitioner also reported on Form 4797, Sales of Business Property, gain of $79,671 on the sale of petitioner's interest in the Rockwell, computed by subtracting from the amount realized of $213,901 an adjusted basis of $134,230. When she prepared the adjusting entries, final depreciation schedule, and 2002 return, Ms. Koskie did not research whether the Cessna qualified for bonus depreciation.

During the return preparation process, Stone & Koskie's return preparation computer software program generated a diagnostics report notifying Ms. Koskie that the program had computed additional depreciation on assets. The diagnostics report stated that the program defaulted to the bonus depreciation deduction for assets with an MACRS method of 20 years or less that were placed in service after September 10, 2001. The diagnostics report further read: "Caution: This deduction is only available when the original use of the property commences with the taxpayer." Ms. Koskie read the report but did not check whether the bonus depreciation claimed for the Cessna and other used assets purchased in 2002 was proper. Ms. Koskie did not give the diagnostics report to petitioner or notify

petitioner whether the Cessna and other used assets purchased in 2002 qualified for bonus depreciation claimed on its 2002 return.

On June 13, 2003, Stone & Koskie sent petitioner its 2002 return with attachments for signature. The cover letter advised petitioner to carefully review the return, and Ms. Koskie offered to answer any questions. Neither Mr. January nor any other employee of petitioner asked questions about the 2002 return. Mr. January, on behalf of petitioner, signed the return without inquiring whether the Cessna and other used assets purchased in 2002 qualified for bonus depreciation. On July 19, 2003, petitioner timely filed its 2002 return.

IV. Audit and Respondent's Adjustments

In January 2005 respondent commenced an examination of petitioner's 2002 return. Examining Officer Amy Dunford was originally assigned to the examination, but in March 2005 Examining Officer Karen Robinson (Ms. Robinson) was assigned to petitioner's case. Ms. Koskie served as petitioner's representative during the examination.

During the examination respondent made several adjustments. First, respondent decreased petitioner's claimed depreciation deduction by $252,075,[10] computed as follows:

---

[10]The parties stipulated the total depreciation-related adjustments of $252,075. However, as indicated by the table, the depreciation-related adjustments totaled $251,270. Respondent used the $252,075 amount in the notice of deficiency and,

(continued...)

| | Asset | Bonus deprec. per return | Bonus deprec. as adjust. | Other deprec. per return | Other deprec. as adjust. | Total adjust. |
|---|---|---|---|---|---|---|
| 1 | Trailer | $8,512 | $8,512 | $3,973 | $1,986 | $1,987 |
| 2 | Lawnmower | 750 | 750 | 350 | 175 | 175 |
| 3 | Golf cart | 1,650 | -0- | 770 | 550 | 1,870 |
| 4 | Trailer | 180 | -0- | 84 | 60 | 204 |
| 5 | Computer | 387 | -0- | 181 | 129 | 439 |
| 6 | Trailer | 996 | -0- | 464 | 332 | 1,128 |
| 7 | Computer | 667 | -0- | 312 | 222 | 757 |
| 8 | Vac. trailer | 9,051 | 9,051 | 4,223 | 2,112 | 2,111 |
| 9 | Vac. trailer | 7,628 | 7,628 | 3,559 | 1,780 | 1,779 |
| 10 | Tank | 7,110 | 7,110 | 3,318 | 1,659 | 1,659 |
| 11 | Copy machine | 1,609 | 1,609 | 751 | 376 | 375 |
| 12 | Icemaker | 233 | 233 | 109 | 55 | 54 |
| 13 | Electric motor | 240 | 240 | 112 | 56 | 56 |
| 14 | Computer | 410 | 356 | 191 | 83 | 162 |
| 15 | 1999 Ford | 4,920 | -0- | 2,296 | 1,640 | 5,576 |
| 16 | 1999 Ford | 4,920 | -0- | 2,296 | 1,640 | 5,576 |
| 17 | Cessna | 225,000 | -0- | 52,500 | 75,000 | 202,500 |
| 18 | Ford F150 | -0- | -0- | 1,145 | 572 | 573 |
| 19 | Freightliner | 13,800 | -0- | 10,733 | 15,332 | 9,201 |
| 20 | 1999 truck | 10,350 | -0- | 8,050 | 11,499 | 6,901 |
| 21 | Time-share condominium | -0- | -0- | 1,007 | -0- | 1,007 |
| 22 | Sunnyvale building | -0- | -0- | 9,397 | 2,217 | 7,180 |
| | Total | | | | | 251,270 |

Respondent adjusted depreciation on items 1 and 2, 8 through 14, and 18 by changing the depreciation method from the MACRS double declining balance (DDB) to the MACRS straight-line (SL) method. Respondent adjusted depreciation on items 3 through 7 and 15 through 17 by changing the depreciation method from the MACRS DDB to the MACRS SL method and disallowing bonus depreciation.

---

[10](...continued)
accordingly, for the penalty calculation.

Respondent adjusted depreciation on items 19 and 20 by computing depreciation using the MACRS DDB method and disallowing bonus depreciation. Respondent disallowed bonus depreciation because the assets were used when placed in service by petitioner. Respondent disallowed a depreciation deduction for the time-share condominium (item 21) because the property was nonbusiness property. Respondent adjusted depreciation claimed for the Sunnyvale building (item 22) by changing the class life of the building from MACRS 31-1/2-year property to MACRS 39-year property. In addition to the depreciation-related adjustments, respondent determined that petitioner realized $227,054 on the disposition of the Rockwell, resulting in a $13,153 adjustment to Form 4797 gain reported on the 2002 return.

The adjustments discussed above resulted in an income tax deficiency of $90,177, which petitioner agreed to and paid. However, petitioner did not agree that it was liable for an accuracy-related penalty under section 6662(a). On May 5, 2006, respondent issued petitioner a notice of deficiency for 2002 determining a section 6662(a) accuracy-related penalty of $18,035 with respect to the entire deficiency.

OPINION

Respondent contends that petitioner is liable for the accuracy-related penalty[11] under section 6662(a) on alternative grounds: (1) The underpayment of tax was attributable to negligence or disregard of rules or regulations under section 6662(b)(1), or (2) there was a substantial understatement of income tax under section 6662(b)(2).[12]

-----

[11]In the notice of deficiency respondent calculated the $18,035 accuracy-related penalty on the basis of the $90,177 underpayment of tax, which in turn was calculated on the basis of the $265,228 total adjustment to income. This adjustment derives from the $252,075 decrease to the claimed depreciation deduction, see supra note 10, and the $13,153 increase in income related to the underreported Form 4797 gain. The decrease to the claimed depreciation resulted from three types of adjustments: (1) The disallowance of bonus depreciation claimed with respect to the Cessna and other used assets; (2) the change of the depreciation method from the MACRS DDB to the MACRS SL method, computing depreciation on the basis of the MACRS DDB method, and change to the class life of a building; and (3) disallowance of a depreciation deduction on the time-share condominium. During trial and on briefs the parties focused on the penalty portion attributable to the bonus depreciation deduction for the Cessna. However, because petitioner contests the entire penalty and respondent calculated the penalty on the basis of all adjustments, we address the issue of whether petitioner is liable for the sec. 6662(a) penalty as it pertains to each of the different types of adjustments.

[12]In schedule 3 attached to the notice of deficiency respondent determined that petitioner was liable for an accuracy-related penalty because of a substantial understatement of income tax. On brief, however, respondent argues that petitioner is alternatively liable for the accuracy-related penalty under sec. 6662(b)(1) because of negligence. Because petitioner addressed the issue in its reply brief, we find no surprise or prejudice to petitioner. See Bissonnette v. Commissioner, 127 T.C. 124, 137 (2006). Accordingly, we address both grounds for the accuracy-related penalty.

Section 6662(a) and (b)(1) authorizes the Commissioner to impose a 20-percent penalty on the portion of an underpayment of income tax attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Disregard of rules or regulations is careless if "the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and is reckless if "the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (stating that negligence is lack of due care or failure to do what a reasonable person would do under the circumstances).

Section 6662(a) and (b)(2) also authorizes the Commissioenr to impose a 20-percent penalty if there is a substantial understatement of income tax. An understatement is substantial in the case of a corporation when it exceeds the greater of 10 percent of the tax required to be shown on the return, or $10,000. Sec. 6662(d)(1).

Respondent bears the burden of production with respect to petitioner's liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty. See sec. 7491(c). Once respondent meets his burden of production, petitioner must come forward with persuasive evidence that respondent's determination is incorrect or that petitioner had reasonable cause or substantial authority for its position. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent has met his burden of production. Respondent established that the amount of understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000 and that petitioner claimed bonus depreciation deductions to which petitioner concedes it was not entitled. See sec. 168(k). Because respondent has met his burden of production, petitioner must produce sufficient evidence to prove that respondent's determination is incorrect. See Higbee v. Commissioner, supra at 446-447. Petitioner concedes as much but argues that the reasonable cause exception under section 6664(c)(1) applies.

Section 6664(c)(1) provides an exception to the section 6662(a) accuracy-related penalty with respect to any portion of an underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith

with respect to such portion. The determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess the proper tax liability. Id. In order for the reasonable cause exception to apply, the taxpayer must prove that it exercised ordinary business care and prudence as to the disputed item. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000), affd. 299 F.3d 221 (3d Cir. 2002). Petitioner bears the burden of proving that it meets the requirements for relief under the section 6664(c)(1) reasonable cause exception. See Higbee v. Commissioner, supra at 446-447.

Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty. See United States v. Boyle, 469 U.S. 241, 250 (1985). Reliance on a tax professional is not an "absolute defense", but merely "a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all of the facts and circumstances. See Neonatology Associates, P.A. v. Commissioner, supra at 98. The taxpayer

claiming reliance on a tax professional must prove by a preponderance of evidence each prong of the following test: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Id. at 99. Reliance on a return preparer is not reasonable where even a cursory review of the return would reveal inaccurate entries. See Pratt v. Commissioner, T.C. Memo. 2002-279.

For purposes of this opinion, we accept that Ms. Koskie was a competent tax professional and that she had sufficient expertise to justify petitioner's general reliance on her. We do not accept, however, that petitioner reasonably relied in good faith on Ms. Koskie's judgment regarding whether to claim bonus depreciation on used assets. Our analysis is set forth below.

A.    Bonus Depreciation Claimed With Respect to Used Assets

When Mr. January signed petitioner's 2002 return and petitioner filed it, section 168(k) unambiguously limited bonus depreciation to original-use assets. See sec. 168(k)(2)(A)(ii). The Job Creation Act authorizing bonus depreciation was signed into law on March 9, 2002, more than 1 year before petitioner filed its 2002 return. The article which Mr. January brought to Ms. Koskie's attention was dated October 14, 2001, and clearly

stated that the bill was not final.  At trial Mr. January could not recall whether at the time of the conversation with Ms. Koskie he understood that the article described a pending bill. Because the article, which was his only source of information on bonus depreciation, referred to pending legislation, we find that Mr. January knew that the article referred to a pending bill rather than final legislation.  This finding is supported by Ms. Koskie's testimony that Mr. January told her that airplanes "were going to be exempt".

Mr. January and Ms. Koskie testified in detail at trial about their conversation.  Mr. January could not recall whether Ms. Koskie ever told him that only original-use assets qualified for bonus depreciation although on cross-examination he recalled her comment that bonus depreciation was limited to first-time use of assets.  Mr. January also testified that his understanding at the time was that the asset had to be new to the owner.  Mr. January remembered discussing with Ms. Koskie whether a used airplane could be considered new if petitioner added a new engine to it.  Ms. Koskie credibly testified that she told Mr. January bonus depreciation was for new (original-use) assets only.  She also testified that Mr. January replied "there was going to be an exception" for used airplanes, on the basis of the article he had read.  We find (1) that Ms. Koskie warned Mr. January regarding her understanding that bonus depreciation applied only to new

(original-use) assets, and (2) that Mr. January was put on notice by the article that legislation regarding bonus depreciation was in a state of flux.

Despite the warnings he received, Mr. January gave Ms. Koskie the 2001 article written before the legislation was enacted with the expectation that she would rely on it to claim on petitioner's financial statements bonus depreciation for used assets acquired during 2002. At trial Mr. January denied ever directing Ms. Koskie to claim bonus depreciation on petitioner's financial statements although he acknowledged stating to Ms. Koskie that he would like to claim bonus depreciation. Ms. Koskie credibly testified that Mr. January and she decided to claim bonus depreciation on petitioner's books. Ms. Koskie used the article as the basis for recording bonus depreciation on the used assets in petitioner's financial statements,[13] and she prepared the return on the basis of petitioner's financial statements. Both the financial statement entries and the preparation of petitioner's 2002 return occurred after the Job Creation Act was signed into law.

---

[13]Ms. Koskie relied on the article without further research. On Oct. 21, 2002, Ms. Koskie prepared adjusting journal entries for April 2002 recording the monthly depreciation, which included bonus depreciation for the Cessna. On Feb. 20, 2003, Stone & Koskie prepared a final depreciation schedule that again claimed bonus depreciation.

On June 13, 2003, Stone & Koskie sent petitioner its 2002 return with attachments. Although Mr. January as petitioner's president had a duty adequately to examine petitioner's return, Mr. January failed to do so. A cursory review of the 2002 Federal Depreciation Schedule attached to the 2002 return would have revealed bonus depreciation claimed for the Cessna. Bonus depreciation claimed for the Cessna was a large item on petitioner's depreciation schedule. On the 2002 return petitioner claimed a depreciation deduction of $586,803 of which almost 40 percent ($225,000) related to bonus depreciation for the Cessna. A prudent person under the circumstances would have inquired before filing the return whether the bill containing the bonus depreciation provision had been enacted. Given Ms. Koskie's initial hesitation on the basis of her understanding that bonus depreciation was only available for new (original-use) assets, a prudent person also would have followed up with Ms. Koskie or another source regarding whether bonus depreciation could be claimed on used assets before filing a return that claimed a substantial bonus depreciation deduction on used assets.

Mr. January, however, turned a blind eye to the issue and did not act as a prudent person would have acted. Despite his knowledge of the uncertainty of petitioner's bonus depreciation position, Mr. January failed to ask Ms. Koskie what she had done

about bonus depreciation on the 2002 return.  Petitioner's claim that it relied in good faith on its accountant is undermined when petitioner's president knew before the return was filed that the article on which he and the accountant were relying referred to a pending bill.

Evidence in the record supports an inference that petitioner and Ms. Koskie may have agreed to play the audit lottery on this point.  The inference is bolstered by Ms. Robinson's notes in Form 9984, Examining Officer's Activity Record (activity record), a stipulated exhibit.[14]  An entry dated April 28, 2005, describes Ms. Robinson's telephone conversation with Ms. Koskie about the bonus depreciation positions on petitioner's 2002 return:

> [I] explained the article was written in late 2001.
> The law was enacted in April of 2002.  Therefore, many
> changes to the bill could have occurred subsequent to
> the article.  I asked if they checked out any changes
> or what the final position was.  * * * [Ms. Koskie]
> stated that Mr. January was aware of the article.  They
> discussed the reliance on it.  They knew it was an
> aggressive position and opted to use it anyway.

At trial Ms. Robinson credibly testified that she wrote down Ms. Koskie's specific words because she found it unusual

---

[14]The activity record was introduced into evidence by the parties as stipulated Exhibit 15-J.  The parties filed the stipulation of facts subject to the "right to object to the admission of any such facts and exhibits in evidence on the grounds of materiality and relevancy".  Petitioner did not reserve any objections to the activity record under Rule 91(d).  Petitioner also raised no objections at the commencement of the trial when the Court admitted all exhibits, including the activity record, into evidence.

that Ms. Koskie did not answer the question whether they had researched "the final position".  She also testified that she understood the word "they" referred to Ms. Koskie and Mr. January.  Although petitioner asserts on brief that Ms. Robinson's statements are "prefabrications" because neither Ms. Koskie nor Mr. January recalled at trial the conversations described by Ms. Robinson, we have no reason to doubt the credibility of Ms. Robinson's contemporaneous entry in her activity record.

The preponderance of the evidence on the issue of the penalty as it pertains to bonus depreciation favors respondent's position that petitioner did not reasonably rely on its return preparer or act in good faith by doing so.[15]  We conclude that petitioner did not reasonably rely on the return preparer in good faith and therefore sustain the section 6662(a) penalty attributable to bonus depreciation erroneously claimed on used assets.[16]

_____

[15]Even if we were to assume the evidence on this issue is absolutely equal, the burden of proof is on petitioner, see Higbee v. Commissioner, 116 T.C. 438, 447 (2001), and we would have to conclude that petitioner has not met its burden of proof.

[16]Although most of the discussion focuses on the bonus depreciation claimed for the Cessna, bonus depreciation was also erroneously claimed for other used assets.  As to the other used assets, petitioner did not introduce any evidence to show the basis for the bonus depreciation deduction or offer any argument why our conclusion regarding the applicability of the sec. 6662

(continued...)

B.    Gain From the Rockwell Sale

We reach a different conclusion, however, with respect to the portion of the underpayment resulting from the underreporting of petitioner's Form 4797 gain.  Ms. Koskie testified that respondent's adjustment of the amount of gain resulted from the fact that the balance of the note payable recorded in petitioner's general ledger which she used to calculate the amount of the gain on the return was incorrect as it did not properly account for interest.  Although petitioner handled a small amount of bookkeeping, the record indicates Stone & Koskie was responsible for the general ledger.  Ms. Koskie testified that "[petitioner] would provide * * * [any information] that I asked for".  She further testified that "There were a lot of notes payable that we had to keep up with, so we had to make sure that we had all the statements from the bank, saying how much interest and principal there was on each note".  We are satisfied that petitioner provided all necessary and accurate information to Stone & Koskie and that petitioner relied in good faith on Ms. Koskie's expertise with respect to proper reporting of the Form 4797 gain from the Rockwell

------

[16](...continued)
penalty should differ depending on the identity of the used asset.

sale.[17]  Accordingly, we conclude that petitioner has established that it had reasonable cause and that it acted in good faith with respect to the calculation of the Form 4797 gain, and we hold that petitioner is not liable for the section 6662(a) penalty with respect to this portion of the underpayment.

## C.  Other Depreciation-Related Adjustments

We also conclude that petitioner had reasonable cause and acted in good faith with respect to other depreciation-related adjustments such as changing the depreciation method from the MACRS DDB to the MACRS SL method, computing depreciation using the MACRS DDB method, and changing the class life of an asset.  The errors were not the result of any negligence on petitioner's part and would not have been readily apparent to petitioner even if petitioner had carefully examined the return.  We conclude that petitioner provided necessary and accurate information to Ms. Koskie and actually relied in good faith on her expertise with respect to these items.

---

[17]The mistake regarding the calculation of the Form 4797 gain that resulted from an error in the general ledger would not be apparent to petitioner even if petitioner had reviewed the general ledger and the return.

D.   Adjustment Related to the Time-Share Condominium

Respondent disallowed a depreciation deduction on a time-share condominium (item 21) because it did not constitute business property.  Petitioner presented no evidence that it supplied to Stone & Koskie all information relevant for establishing whether a depreciation deduction with respect to the time-share condominium was appropriate, including the business use of the asset.  We do not need to address whether petitioner relied in good faith on Ms. Koskie's proper treatment of the item on the 2002 return, as we conclude petitioner failed to show that it provided all necessary and accurate information regarding the asset. Accordingly, we sustain respondent's determination to impose a section 6662(a) penalty as it pertains to the adjustment with respect to this item.

To reflect the foregoing,

Decision will be entered

under Rule 155.