T.C. Memo. 2011-105


UNITED STATES TAX COURT


WEEKEND WARRIOR TRAILERS, INC., ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.  6984-08, 6997-08,    Filed May 19, 2011.
              15166-08.


Pietro E. Canestrelli and Stanley A. Harter, for

petitioners.

Heather K. McCluskey and Monica D. Gingras, for respondent.

---

[1]Cases of the following petitioner are consolidated
herewith:  Mark E. Warmoth, docket Nos. 6697-08 and 15166-08.

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  In separate notices of deficiency respondent determined deficiencies in petitioners' Federal income taxes and accuracy-related penalties under section 6662(a)[2] as follows:

| Docket | Petitioner | Year | Deficiency | Penalty Sec. 6661(a) |
|--------|-----------|------|-----------|----------------------|
| 6984-08 | Weekend Warrior Trailers, Inc. | 2002 | [1]$1,117,383 | $446,953 |
| 6997-08 | Mark E. Warmoth | 2002 | 14,836 | 2,967 |
|  |  | 2003 | 1,252,944 | 250,589 |
| 15166-08 | Mark E. Warmoth | 2004 | 471,615 | 94,323 |

[1]All monetary amounts have been rounded to the nearest dollar.  Respondent subsequently asserted an increased deficiency in each docket.  See <u>infra</u> pp. 33-36.

Petitioners contested the determinations by filing timely petitions.  The resulting cases have been consolidated.

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[3] the issues for decision with respect to Weekend Warrior are: (1) Whether Weekend Warrior is entitled to management fee deductions of $4,175,000, $4,800,000, and $4,595,000 for 2002, 2003, and 2004, respectively, (2) whether Weekend Warrior is entitled to depreciation deductions with respect to the airplane and the Nordic boat (boat), (3) whether Weekend Warrior is entitled to airplane expense deductions, (4) whether Weekend Warrior has interest income under section 7872 from loans to Mark E. Warmoth (Mr. Warmoth) for each year at issue, and (5) whether Weekend Warrior is liable for the accuracy-related penalty under section 6662(a) for 2002.

---

[3]Weekend Warrior Trailers, Inc. (Weekend Warrior), concedes depreciation deductions with respect to the Malibu boat of $5,885, $3,531, and $3,531 for 2002, 2003, and 2004, respectively. At trial and on brief respondent asserted adjustments to ending inventory for each year different from those in the notices of deficiency. Respondent asserts these adjustments equal $234,423, $222,115, and $539,786 for 2002, 2003, and 2004, respectively. Petitioners failed to address the adjustments to ending inventory in the opening brief, and in the reply brief petitioners state that they concede the adjustments to Weekend Warrior's ending inventory. At trial and on brief respondent states that the forgone interest adjustment under sec. 7872 to Weekend Warrior's 2002 return should be $39,896 rather than $41,343 as he had determined in the notice of deficiency, and we treat the $1,447 difference as respondent's concession. Lastly, at trial Revenue Agent Timothy Burke testified that the adjustment to depreciation deduction with respect to the 1994 Beechcraft 58 Baron airplane (airplane) for 2003 should be $31 lower than what respondent had determined in the notice of deficiency; we treat the difference as respondent's concession.

The issues for decision with respect to Mr. Warmoth are: (1) Whether Mr. Warmoth is entitled to items of deduction that flow through from Weekend Warrior in 2003 and 2004 in the light of the issues listed above,[4] (2) whether Mr. Warmoth received unreported constructive dividend income from Weekend Warrior in 2002, and (3) whether Mr. Warmoth is liable for the accuracy-related penalty under section 6662(a) for each year at issue.[5]

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts is incorporated herein by this reference. Mr. Warmoth resided in California when he filed his petitions. Weekend Warrior's principal place of business was also in California when it filed its petition.

I.  Background

Mr. Warmoth started riding dirt bikes and off-road vehicles when he was 9 years old. After graduating from high school, Mr. Warmoth worked for a major recreational vehicle (RV) manufacturer for 14 years.

A self-described "desert rat", Mr. Warmoth vacationed in the desert, where off-road enthusiasts travel to ride off-road vehicles. To transport their off-road vehicles to the desert,

---

[4]Our conclusions with respect to Weekend Warrior for 2003 and 2004 resolve this issue. See sec. 1366(a)(1).

[5]Other adjustments to Mr. Warmoth's 2002-04 tax returns are computational.

off-road enthusiasts build trailers.  Having learned how to build RVs during his employment with the RV manufacturer, Mr. Warmoth developed a unique recreational travel trailer to serve this niche market.  The concept of the product was a trailer with a drop-down back that could accommodate a motorcycle or an off-road vehicle.  In 1988 he started his own business of mass-producing the trailers.

Originally, Mr. Warmoth's business was "doing business as" Warrior Manufacturing.  On August 5, 1995, the business was incorporated as Weekend Warrior.[6]  Between 1995 and 2002 Weekend Warrior was a C corporation.  Effective January 1, 2003, Weekend Warrior elected S corporation status.  From its incorporation through December 31, 2009, Mr. Warmoth was the sole shareholder of Weekend Warrior.  From January 1, 2000, through December 31, 2005, Mr. Warmoth was Weekend Warrior's chief executive officer (CEO) and president.

Weekend Warrior designed, manufactured, and sold travel trailers.  It manufactured lightweight models at the main plant located at 1320 Oleander Avenue, Perris, California, a leased facility.  Another facility, located in the same neighborhood, manufactured heavy-duty wide-body expensive trailers, such as fifth wheelers and full trailers.

---

[6]In 2002-04 Warrior Manufacturing was a corporation wholly owned by Weekend Warrior.  It was a service warranty and parts subsidiary and provided warranty work.

Most of the manufacturing process took place outside; the employees started work in the morning and finished by dark because there were no lights outside. Mr. Warmoth spent 5 or 6 days per week at the factory and showed trailers to potential customers approximately 40 weekends annually. Weekend Warrior owned most of the equipment used in the manufacturing process.

Before the changes in structure described below, Weekend Warrior's main departments were sales, production, and purchasing. Other departments, namely, engineering, service, accounting, and operations, were on a lesser pay scale, as they were perceived to be slightly less valuable. From December 31, 2001, through January 1, 2006, Weekend Warrior had three top managers who reported directly to Mr. Warmoth: Corrie Stoap (Mr. Stoap), who was in charge of purchasing and later held the position of operations manager and vice president; Gary Denton (Mr. Denton), a sales manager; and Kris Hansen (Mr. Hansen), a production manager, who later became vice president of production.

Weekend Warrior organized the manufacturing process in runs. Each run produced similar models. On average, 80 percent of the materials used in the production of trailers was the same. Depending on the model, the run could last 1 or 2 weeks. If a run was 25 trailers long, the purchasing department bought 25 refrigerators, 25 stoves, and 100 tires.

To minimize the need for cash outlay and physical space, Weekend Warrior used just-in-time purchasing. Materials were delivered a few days before they were needed, although Weekend Warrior purchased a 2-week supply of smaller, less expensive items and reordered them when the supply ran low. The purchasing manager at each plant was responsible for inventory on hand, its turnover, and the amount of cash tied up in inventory. Suppliers billed Weekend Warrior for materials and supplies.

Weekend Warrior sold its products through a dealer network. It had ongoing relationships with various dealerships. Generally, Weekend Warrior was paid 3 weeks after selling a trailer to a dealer, which created a cashflow problem because Weekend Warrior paid expenses for labor and material as it was building a trailer. Warrior Manufacturing was responsible for warranty work on sold trailers.

Mr. Warmoth was the "sole driving force behind the product." He performed design work. Around 2002 Mr. Warmoth received his first patent; it was a patent for a part inside a trailer. Mr. Warmoth subsequently received patents for sofa armrests and a bed. Weekend Warrior held approximately six trademarks.[7]

At some point before 1995 Weekend Warrior implemented the Weekend Warrior Bonus Plan (bonus plan) using as a template the

---

[7]There was a trademark on the Weekend Warrior company name, but it is not clear who owned it.

bonus plan of the company for which Mr. Warmoth had worked before starting Weekend Warrior.  The bonus plan was not limited to the top managers but rather was for key employees.  Under the bonus plan, one-third of Weekend Warrior's profits became a key employee pool.  One-half of the key employee pool was split among the top managers and Mr. Warmoth.  One-half of the remaining amount was split among eight assistant managers.  The remainder was split among managers at various levels.

Weekend Warrior had no incentive structure for rank-and-file employees.  Motivating them was a challenge.  The funds remaining after compensating key employees under the bonus plan were insufficient to motivate rank-and-file employees.

By 1997 Weekend Warrior's annual sales had reached $3 million.  Around 1998 off-roading became a popular form of recreation.  Weekend Warrior's gross sales started growing at the annual rate of 50 percent and reached $40 million in 2002.  For 2 or 3 years thereafter gross sales continued to grow at the annual rate of 50 percent.

Weekend Warrior had no human resources department, so Mr. Hansen handled employee matters.  He calculated workforce needs on the basis of production schedules, and he hired and fired employees accordingly.  To fill an open position, Mr. Hansen placed an advertisement, although many applicants learned about job openings at Weekend Warrior through "word of mouth".  Weekend

Warrior advertised positions with special requirements and used headhunters when searching for specific talent.  The receptionist answered phone calls and passed potential hires' contact information to Mr. Hansen.  Mr. Hansen then invited the applicants for interviews and made hiring decisions.[8]  Weekend Warrior did not issue formal offer letters or enter into employment contracts when hiring new employees.  Terminating employees was delegated to assistant managers and production managers.  Approximately 85 percent of employees worked for Weekend Warrior's manufacturing department.  Although a number of employees had been employed by Weekend Warrior for 15 years, there was a high turnover rate for entry-level employees.

Weekend Warrior employed a controller, but an outside accounting firm handled "all of the detail work".  After 2002 Ray Espera (Mr. Espera) held the controller position.  Mr. Espera and Mr. Stoap were responsible for maintaining the books and records.

Weekend Warrior maintained a securities account at Comerica Bank (Comerica) and three accounts with Foothill Independent Bank (Foothill).  Mr. Warmoth was the only individual with signature authority over Weekend Warrior's accounts.

---

[8]Mr. Hansen's testimony on this point appears inconsistent with stipulation No. 179, according to which Mr. Warmoth made all hiring decisions for Weekend Warrior.  We found Mr. Hansen's testimony on the point convincing and make our findings of fact regarding the foregoing on the basis of Mr. Hansen's testimony.

II.  The 2002 Changes

    A.  Mr. Warmoth's Group of Advisers

Before 2002 Weekend Warrior engaged the services of attorney John Dana Mitchellweiler (Mr. Mitchellweiler), a partner at Smith, Mitchellweiler in Riverside, California.  Mr. Mitchellweiler described himself as an outside general counsel to Weekend Warrior.  Mr. Mitchellweiler practiced law in the business and estates areas.  As of the date of trial Mr. Mitchellweiler had practiced law for 15 years.

In August 2002 Mr. Mitchellweiler introduced Mr. Warmoth to William R. Lindsey (Mr. Lindsey).  Mr. Lindsey was a financial adviser with 27 years of financial planning experience and was formerly employed by New York Life.  Mr. Lindsey holds a master's degree in financial services and certificates in business succession and executive compensation and is an accredited estate planner.  Mr. Lindsey was a part of an "architectural team of designers" for clients' estate planning, investment, and life insurance needs.

Mr. Warmoth hired Mr. Lindsey to prepare an overall plan for him.  Mr. Lindsey's firm prepared an outline of Mr. Warmoth's goals that summarized Mr. Warmoth's financial philosophy.  The goals included developing an investment strategy, achieving financial independence, establishing an estate plan, and other objectives.

Mr. Warmoth also sought general advice as to how to handle the company's rapid growth.

On the basis of Mr. Warmoth's needs, Mr. Lindsey put together a team of advisers--Mr. Lindsey and his pension administration firm; Mr. Mitchellweiler; Greg Siegler, a certified public accountant from the accounting firm Crabtree & Associates; Steve Tweedlie, an auditor from Crabtree & Associates; Ken Baily (Mr. Baily), a valuation analyst; Curt McCombs from Comerica; and Roland Attenborough, an attorney from Reish & Luftman.[9]  Mr. Lindsey coordinated the team members and the document preparation.  In the last quarter of 2002 the team members met several times to discuss various options.

B.    The New Structure and Various Compensation Plans

The team of advisers recommended the creation of Leading Edge Designs, Inc. (Leading Edge).  On November 11, 2002, the articles of incorporation of Leading Edge were executed.  On November 14, 2002, Leading Edge was incorporated under the laws of California.  Effective November 14, 2002, Leading Edge elected S corporation treatment.  Mr. Mitchellweiler drafted incorporation documents and provided tax advice regarding the consequences of forming an S corporation.

---

[9]Mr. Lindsey recommended the professionals to Mr. Warmoth, and Mr. Warmoth decided who should be on the team.

Mr. Warmoth received 10,000 shares of Leading Edge stock. Mr. Warmoth was to pay $20,000 for the shares, but he failed to execute a promissory note or pay the required amount. Mr. Warmoth was the only member of the board of directors, and in this capacity on November 14, 2002, he adopted bylaws. Through December 31, 2005, Mr. Warmoth was the CEO and president of Leading Edge. From incorporation through January 1, 2003, Mr. Warmoth was also the secretary of Leading Edge. Starting January 2, 2003, Mr. Stoap became the secretary.

Effective December 15, 2002, Leading Edge established a deferred compensation arrangement (deferred compensation plan) "for a select group of management or highly-compensated personnel". According to the Accrued Severance Agreement establishing the plan, the deferred compensation plan was an unfunded arrangement and the board was to resolve annually which employees were entitled to participate in it. The accrued severance amounts allocated to an employee were deferred until the employee's involuntary termination, retirement, resignation, disability or death, or in the event of emergency or necessity. The contingent right to future payments could be forfeited (1) if the employee were discharged for acts which in the opinion of the board constitute embezzlement of corporate funds or (2) if the employee entered into business or employment which the board determined to be detrimentally competitive or substantially

injurious to Leading Edge.  However, the board could order that the right to the accrued payments was no longer subject to forfeiture, and it could allow the payment of the vested amounts "if it finds such action appropriate in the circumstances."  The purpose of the deferred compensation plan was to allow Mr. Warmoth to obtain a benefit out of Leading Edge other than wages.

Although Mr. Mitchellweiler and Mr. Warmoth discussed a severance agreement for the top managers as an incentive mechanism, as discussed below, see infra pp. 21, 24, for 2002 and 2003 Mr. Warmoth was the only person entitled to participate in the deferred compensation plan.  Under the deferred compensation plan his compensation was $4 million and $4.1 million for 2002 and 2003, respectively.

On December 28, 2002, the Leading Edge board adopted the Weekend Warrior Retirement Plan (retirement plan),[10] effective November 14, 2002.[11]  The retirement plan had two components. The first was the employee stock ownership plan (ESOP), which was a stock bonus plan under section 401(a) and an employee stock ownership plan as defined in section 4975(e)(7).  The second was the section 401(k) profit-sharing plan under section 401(a) as

---

[10]The copy of the retirement plan contained in the record is missing pp. 24 through 60, 65 through 76, and 78 through 88.

[11]The Weekend Warrior Retirement Plan and Trust Agreement (trust agreement), however, recites that the effective date was Dec. 1, 2002.  The discrepancy in the effective dates does not affect our resolution of the issues.

well as a cash or deferred arrangement under section 401(k).  The retirement plan covered all employees of Leading Edge aged 21 and older with at least 1 year of employment.  All assets acquired under the retirement plan were to be held in a trust in accordance with the provisions of the trust agreement.  The trust agreement was signed on December 28, 2002, but was effective as of December 1, 2002.  Messrs. Warmoth and Stoap were the trustees.

On December 18, 2002, Mr. Warmoth sold 9,990 shares of Leading Edge stock to the retirement plan for $1.50 per share.[12] Mr. Baily valued the stock for purposes of the sale.  The retirement plan executed a promissory note according to which it would pay Mr. Warmoth $14,985 in four quarterly installments.  Mr. Mitchellweiler advised Mr. Warmoth that selling a part of the Leading Edge shares to an ESOP was a necessary part of establishing it.  Mr. Warmoth understood that the employees of Leading Edge would split the value of Leading Edge depending on length of employment.  Mr. Warmoth signed the stock purchase agreement in his capacities as the trustee of the retirement plan, president of Leading Edge, and the selling shareholder.[13]

---

[12]The parties stipulated the described sale took place on Dec. 19, 2002, but the stock purchase agreement is dated Dec. 18, 2002.

[13]A copy of the Leading Edge Capitalization and Ownership record incorrectly refers to the retirement plan as "Leading Edge
(continued...)

On December 28, 2002, Weekend Warrior and Leading Edge entered into a Management, Design, and Personnel Services Agreement (management agreement). Mr. Mitchellweiler drafted the management agreement. Mr. Warmoth signed the management agreement on behalf of each party. The term of the management agreement was from December 20, 2002, through December 31, 2003.

According to the recitals, Weekend Warrior sought to centralize its general management functions such as accounting, marketing, sales and purchasing, human resources, and product research and development. Under the management agreement Leading Edge was to provide three types of services to Weekend Warrior: Design, personnel, and management services. The design services included research and development of trailer and other product design plans, patent and trademark acquisition, and industry trend analysis. The essence of the personnel services arrangement was that Leading Edge accepted the transfer of all employees of Weekend Warrior[14] and promised to lease those employees to Weekend Warrior on terms to be agreed on.

---

[13](...continued)
Designs, Inc., ESOP". It also incorrectly shows the number of shares that the retirement plan purchased as 9,900 rather than 9,990. These inconsistencies in the record do not affect our resolution of the issues.

[14]The management agreement refers to schedule B containing the list of Weekend Warrior employees transferred to Leading Edge, but schedule B was left blank.

The last type of services, management services, was described in schedule A attached to the management agreement. Management services included "all executive management services required by Weekend Warrior in order to conduct its business operations" and consisted of three components: Executive personnel services, fiscal services, and purchasing. With respect to the first component, Leading Edge agreed to recruit, select, hire, and supervise all executive personnel. The executive personnel would perform the executive management services for Weekend Warrior. According to schedule A, all executive personnel were to be Leading Edge's employees, and Leading Edge was to enter into employment agreements with them and pay their salaries and benefits. The second component of the management services was fiscal services, which included cash management, accounting, bookkeeping, accounts payable, and recordkeeping. The last component of the management services was the purchasing function. Under the management agreement, Leading Edge became responsible for negotiating the purchase of all supplies, equipment, materials, goods, and services necessary for Weekend Warrior's operations. The cost of supplies, equipment, and materials remained the responsibility of Weekend Warrior.

Under the management agreement, Weekend Warrior was to compensate Leading Edge as follows. Weekend Warrior was to pay Leading Edge an initial payment of $4,175,000. That amount was

payable for: (1) Design services and management services in December 2002, (2) bonus payments to leased employees, and (3) as an inducement by Weekend Warrior for Leading Edge to enter into the management agreement.

According to the management agreement, for management services provided in 2003, Leading Edge's compensation was an amount equal to 8 percent of Leading Edge's annual gross receipts, with a $150,000 minimum monthly payment. For personnel services Weekend Warrior was to pay Leading Edge an amount equal to 5 percent of the gross payroll and liabilities of all employees leased to Weekend Warrior.

### C. Operations After the Changes

#### 1. In General

Weekend Warrior's gross sales continued to increase at the rate of 50 percent annually. In 2003 and 2004 Weekend Warrior acquired a 51-percent interest in a factory in Caldwell, Idaho, and a factory in southern California. Each facility had a specific function. The main plant in Perris, California, continued to manufacture lightweight trailer models. The second facility in Perris, California, continued to build more expensive heavy-duty wide-body products. By 2005 Weekend Warrior operated four factories and produced trailers with 25 different floorplans.

Mr. Warmoth remained Weekend Warrior's CEO and received wages from both Leading Edge and Weekend Warrior. Sometimes, however, he deferred payment because he did not need the money. Mr. Warmoth signed documents on behalf of Weekend Warrior because various vendors and other entities required Weekend Warrior's representative to sign documents.

Messrs. Stoap, Denton, and Hansen continued to report to Mr. Warmoth. Mr. Hansen became a vice president of Weekend Warrior.[15] As a vice president, he was responsible for overseeing five assembly lines, writing schedules, and ensuring that production deadlines were met. He was no longer involved in the day-to-day operations and was responsible for overseeing multiple plants, so he delegated responsibilities. He remained responsible for writing schedules but was no longer involved in employee matters, such as hiring and firing. Suppliers continued to bill Weekend Warrior for materials and supplies.

Leading Edge was located at the same address as Weekend Warrior's main manufacturing plant and main office. It was housed in a mobile home on a lot next-door. Leading Edge had the same phone number as Weekend Warrior. Leading Edge did not manufacture any products.

---

[15]Mr. Hansen testified that he became vice president of manufacturing. Other references in the record indicate that Mr. Hansen became vice president of production.

The human resources department was organized at Leading Edge.  Tucker May (Mr. May), who had a small staff, worked on human resources issues, including workers' compensation.  Instead of placing advertisements for open positions, Mr. Hansen contacted Mr. May regarding Weekend Warrior's workforce needs, which grew with the acquisitions of the two additional factories. Leading Edge advertised open positions, interviewed people, and hired employees on the basis of Mr. Hansen's requirements.  Mr. Warmoth made all hiring decisions for Leading Edge.

Leading Edge used Paychex as a third-party service provider. Weekend Warrior also used Paychex in 2000-2003.  Paychex processed payroll checks and prepared management reports, including employee earnings statements, payroll journals, month-to-date department summaries, tax liabilities and deposits, and worksheets to record the next month's payroll.  Both Weekend Warrior and Leading Edge kept most payroll records at 1320 Oleander Avenue, Perris, California, but some records were kept at the Paychex business locations.  Weekend Warrior did not provide health insurance benefits to its employees in 2000-2003. Leading Edge did not provide health insurance benefits to its employees in 2002-04.

Leading Edge maintained a portfolio account with Advest, Inc.  From August 2003 through December 2004 Leading Edge

maintained a portfolio of stocks and received dividends.[16]
Leading Edge also maintained checking accounts with Foothill and
Comerica.  Mr. Warmoth was the only individual with signature
authority on Leading Edge's accounts.

2.  2002

From its incorporation on November 14, 2002, through
yearend, Mr. Warmoth was the only employee of Leading Edge.  He
did not enter into a written employment agreement with Leading
Edge.  In 2002 Leading Edge issued Weekend Warrior invoices for
management fees under the management agreement.  The description
column of each invoice stated "Management Fee".  The amounts were
as follows:[17]

| Date | Amount |
|------|--------|
| Sept. 30, 2002 | $600,000 |
| Oct. 31, 2002 | 680,000 |
| Nov. 30, 2002 | 995,000 |
| Dec. 31, 2002 | 700,000 |
| Total | 2,975,000 |

Weekend Warrior paid Leading Edge as follows:

| Date | Amount |
|------|--------|
| Dec. 20, 2002 | $600,000 |
| Dec. 27, 2002 | 700,000 |
| Dec. 30, 2002 | 680,000 |
| Dec. 31, 2002 | 995,000 |
| Total | 2,975,000 |

---

[16]The record does not contain Advest, Inc. account
statements for other periods.

[17]These invoices are the only invoices issued by Leading
Edge to Weekend Warrior contained in the record.

Weekend Warrior continued having cashflow problems. Leading Edge made the following payments to Weekend Warrior:

| Date | Amount |
|------|--------|
| Dec. 27, 2002 | $600,000 |
| Dec. 28, 2002 | 650,000 |
| Dec. 30, 2002 | 660,000 |
| Total | 1,910,000 |

Weekend Warrior reported a note payable of $1,910,000, and Leading Edge reported a note receivable from Weekend Warrior in the same amount.

For 2002 Mr. Warmoth received wage income of $200,808 from Weekend Warrior and $38,100 from Leading Edge. Leading Edge did not issue any Forms W-2, Wage and Tax Statement, for 2002, nor did it report any Form W-2 wages during 2002. Leading Edge also did not make any quarterly employment tax deposits during 2002.

On December 30, 2002, Mr. Warmoth, as the sole director of Leading Edge, executed a resolution stating that he was the only employee entitled to participate in the deferred compensation plan for 2002 and that his compensation thereunder was $4 million.

### 3. 2003

At some point during 2003 Weekend Warrior employees were transferred to Leading Edge, and Leading Edge started leasing those employees to Weekend Warrior.[18] Leading Edge did not issue

---

[18]No documents are available regarding the employee

(continued...)

a formal letter of employment or enter into employment contracts when hiring new employees.

Employees began receiving their paychecks from Leading Edge. Many employees normally cashed their paychecks at liquor stores, and those employees encountered problems because the stores did not know what Leading Edge was.  The transfer of Weekend Warrior's employees to Leading Edge and the interruption in the employees' length of employment also became a problem for employees who were buying houses.

During 2003 Weekend Warrior made the following payments by check to Leading Edge for management and design services:

| Date | Amount |
| --- | --- |
| Aug. 15, 2003 | $100,000 |
| August 2003 | 200,000 |
| Aug. 21, 2003 | 100,000 |
| Aug. 31, 2003 | 400,000 |
| Oct. 3, 2003 | 100,000 |
| Oct. 6, 2003 | 150,000 |
| Oct. 7, 2003 | 100,000 |
| Total | [1]1,150,000 |

[1]In stipulation No. 207 the parties incorrectly totaled these payments.

During 2003 Weekend Warrior accrued a management fee liability of $2,276,081.  As of December 31, 2003, Weekend Warrior reported an accrued management fee of $3,476,081 due to Leading Edge.

_____

[18](...continued)
transfer.  Other than the management agreement, no documents are available regarding employee leasing either.

During 2003 Leading Edge made the following payments to Weekend Warrior:

| Date | Amount |
|------|--------|
| Jan. 2, 2003 | $980,000 |
| July 1, 2003 | 400,000 |
| Sept. 12, 2003 | 100,000 |
| Total | 1,480,000 |

During 2003 Mr. Warmoth received $66,500 from Weekend Warrior and $316,700 from Leading Edge.[19]  Mr. Hansen received wages of $41,066 from Weekend Warrior and of $404,340 from Leading Edge.  Mr. Stoap received $175,634 in wages from Leading Edge only.  Mr. Denton received $187,441 in wages from Leading Edge only.  Leading Edge paid combined wages of $1,084,115 to Mr. Warmoth and the three top managers, whereas Weekend Warrior paid them $107,566 in combined wages.  Both Leading Edge and Weekend Warrior issued Forms W-2 to most employees.

Leading Edge did not file a Form 941, Employer's Quarterly Federal Tax Return, for the quarter ended March 31, 2003. Weekend Warrior did not file Forms 941 for the quarters ended September and December 2003.[20]  Leading Edge filed Forms 941 for those quarters.  Weekend Warrior claimed a worker compensation deduction of $213,543 for 2003.

---

[19]The record contains copies of checks totaling $244,528 that Leading Edge issued to Mr. Warmoth in 2003.

[20]The parties' stipulations Nos. 212 and 215 are contradictory as to whether Weekend Warrior filed a Form 941 for the quarter ended Mar. 31, 2003.

As of the plan year ended December 31, 2003, the retirement plan had 181 participants and/or beneficiaries.

On December 30, 2003, Mr. Warmoth, as the sole director, executed a resolution stating that he was the only employee entitled to participate in the deferred compensation plan and that his compensation thereunder for 2003 was $4.1 million.

4. 2004

By letter dated February 23, 2004, the Internal Revenue Service determined that the retirement plan and related trust were designed in accordance with the applicable sections of the Code.

Weekend Warrior made the following transfers by phone from its Comerica account to Leading Edge's Comerica account:

| Date | Amount |
|------|--------|
| May 13, 2004 | $174,467 |
| May 20, 2004 | 160,000 |
| May 24, 2004 | 349,634 |
| Total | 684,101 |

During 2004 Mr. Warmoth received wages of $125,000 from Leading Edge but did not receive any wages from Weekend Warrior. Leading Edge paid the top managers wages as follows: (1) Mr. Denton, $225,920, (2) Mr. Hansen, $36,115, and (3) Mr. Stoap,

$183,761. Leading Edge thus paid the top managers and Mr. Warmoth $570,796 in wages.[21]

Weekend Warrior did not file Forms 941 for any quarters in 2004. Leading Edge issued Forms W-2 for 2004 and filed Forms 941 for every quarter of 2004.

Weekend Warrior continued to experience working capital shortfalls, and it borrowed money from Leading Edge and Mr. Warmoth. Between April 1 and December 31, 2004, Weekend Warrior signed several promissory notes. On April 1, 2004, Weekend Warrior signed two notes promising to pay Leading Edge $1,075,000 and $2,971,882. On December 31, 2004, Weekend Warrior executed additional promissory notes for $3,169,987, $430,934, and $3,653,062 reflecting loans from Leading Edge.

Upon Mr. Lindsey's advice, on June 1, 2004, Leading Edge acquired all of its shares from the retirement plan. According to the stock repurchase agreement dated June 1, 2004, Leading Edge purchased 9,990 shares of common stock held by the retirement plan for $150,000. Mr. Warmoth again became Leading Edge's sole shareholder. Mr. Mitchellweiler's firm prepared the documents related to the sale. Mr. Baily valued the shares at

---

[21]The record contains no information as to wages Weekend Warrior paid any individuals for 2004, other than that Mr. Warmoth received no wages from Weekend Warrior.

$189,500.[22]  The reason for the 2004 sale was a change in rules under section 409(p) that made the structure unattractive.

As of the plan year ended December 31, 2004, the retirement plan had 226 participants and/or beneficiaries.

> 5.  <u>After 2004</u>

The parties stipulated that Leading Edge was inactive after December 31, 2004.[23]  The retirement plan was terminated and was converted into a profit-sharing plan which stayed in effect until Mr. Warmoth started experiencing financial difficulties.  Since 2006 and as of the date of trial, the retirement plan had been in the process of winding down and distributing assets to its beneficiaries.  Weekend Warrior ceased operations in July 2008 because of cashflow problems.[24]

---

[22]Mr. Baily's appraisal is dated July 21, 2004.  Mr. Baily valued Leading Edge on the basis of historic earnings.  Mr. Baily subtracted $4 million and $4.1 million for 2002 and 2003, respectively, from Leading Edge's operating profits to account for Mr. Warmoth's compensation under the deferred compensation plan.

[23]Contrary to the parties' stipulation, the record contains Leading Edge's 2005 and 2006 Forms 1120S, U.S. Income Tax Return for an S Corporation, showing gross sales of $29,866,317 and $39,420,742, respectively.

[24]At some point Mr. Warmoth "lost control" of accounting. In October 2007, to Mr. Warmoth's surprise, Weekend Warrior lost money for the first time.  In Mr. Warmoth's words, "the books were being bent so we could borrow more money from a bank and pay bonuses every step of the way."  In addition, warranties that Weekend Warrior authorized its dealers to extend and that should have been shown as payables were not reflected in Weekend Warrior's accounting records.  On a date that does not appear in
(continued...)

III. The Airplane and Boat

A.    The Airplane

During 2002 Weekend Warrior purchased an airplane.  The Purchase Order/Aircraft Purchase Agreement shows Mr. Warmoth as the buyer.  The U.S. Department of Transportation, Federal Aviation Administration, Certificate of Aircraft Registration, however, shows Weekend Warrior's name but lists its address as 8635 Moovalya Dr., Parker, Arizona.

The airplane was based out of Parker, Arizona.  Between December 31, 2001, and January 1, 2005, Weekend Warrior had no manufacturing operations in Arizona, but from July 30, 1999, through December 1, 2003, Mr. Warmoth owned property there.

Accounting and pilot flight logs do not list any business purpose for flights on the airplane.  During 2002-04 Weekend Warrior did not maintain a contemporaneous mileage log describing the purposes of any flights.

B.    The Boat

In January 2001 Mr. Warmoth and Weekend Warrior purchased a boat.  The Marine Purchases Agreement provides that "Mark Warmoth

---

[24](...continued)
the record, the bank stopped lending money to Weekend Warrior. Weekend Warrior ceased operations in July 2008 after it filed the petition, but it did not file a bankruptcy petition.  Comerica "took" all valuable assets of Weekend Warrior and Leading Edge, including the names "Weekend Warrior Trailers" and "Leading Edge Design" and Mr. Warmoth's patents.  The record is not clear on whether Comerica owns Weekend Warrior stock.

(Weekend Warrior)" was the purchaser and lists Mr. Warmoth's address in California. It was a river boat to be used on the Colorado River. Mr. Warmoth owned a house on the river where he entertained almost every weekend in both summer and winter. Weekend Warrior did not maintain a contemporaneous log regarding the business use of the boat.

IV. Weekend Warrior's Loans to Mr. Warmoth

On its Schedules L, Balance Sheets Per Books, which are a part of the Forms 1120, U.S. Corporation Income Tax Return, and Forms 1120S, Weekend Warrior reported loans to shareholders as follows:

| Year | Loan amount |
|------|-------------|
| 2002 | $1,205,325 |
| 2003 | 2,019,153 |
| 2004 | 3,421,458 |

During the years at issue Mr. Warmoth was Weekend Warrior's only shareholder.

V. Procedural History

Weekend Warrior timely filed its 2002 Form 1120 pursuant to an extension. Weekend Warrior filed its 2003 Form 1120S[25] and timely filed its 2004 Form 1120S pursuant to an extension.

Weekend Warrior claimed deductions for management and employee leasing fees paid to Leading Edge as follows:

---

[25]It is not clear whether Weekend Warrior filed its 2003 Form 1120S timely.

| Year | Management fee | Employee leasing fee |
|------|---------------|---------------------|
| 2002 | $4,175,000 | -0- |
| 2003 | 4,800,000 | $13,067,430 |
| 2004 | [1]4,595,000 | 14,055,577 |

[1]On the 2004 Form 1120S, Weekend Warrior reported a $1,626,198 deduction for designer costs and a $2,968,802 deduction for marketing services.

During the years at issue Weekend Warrior claimed depreciation deductions with respect to the airplane as follows:

| Year | Special depreciation | Depreciation | Total depreciation |
|------|---------------------|--------------|--------------------|
| 2002 | $160,000 | $74,667 | $234,667 |
| 2003 | -0- | 170,667 | 170,667 |
| 2004 | -0- | 170,667 | 170,667 |

Weekend Warrior also claimed other airplane-related expenses.

Weekend Warrior claimed depreciation with respect to the boat as follows:

| Year | Depreciation |
|------|--------------|
| 2002 | $30,661 |
| 2003 | 21,897 |
| 2004 | 21,897 |

Leading Edge filed its 2002-04 Forms 1120S.[26] Leading Edge included in its income management and employee leasing fees as follows:

---

[26]Leading Edge filed its 2002 and 2003 Forms 1120S timely, but it is not clear whether the 2004 Form 1120S was filed timely.

| Year | Management fee | Employee leasing fee |
|------|----------------|----------------------|
| 2002 | $4,175,000 | -0- |
| 2003 | 4,800,000 | $13,067,430 |
| 2004 | [1]2,000,000 | [1]17,371,877 |

[1]The parties stipulated that "The Gross Receipts claimed by Leading Edge Design's [sic] include management fee income in the amount of $4,595,000 and employee leasing income in the amount of $14,055,577 for the taxable year 2004." However, on its 2004 Form 1120S Leading Edge reported income amounts as shown in the table above. The categories of income as stipulated by the parties total $18,650,577, whereas the 2004 Form 1120S shows they total $19,371,877. We disregard this stipulation as inconsistent with the record. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

Leading Edge also reported gross income consisting of $5,704 of miscellaneous income for 2003 and $2,205 of other income and $176,495 of investment income for 2004.

Mr. Warmoth filed his 2002-04 Forms 1040, U.S. Individual Income Tax Return.[27] On his Forms 1040 Mr. Warmoth reported (1) passive income of $4,134 from Leading Edge for 2002; (2) nonpassive income of $4,014 from Leading Edge and a nonpassive loss of $22,281 from Weekend Warrior for 2003; and (3) a nonpassive loss of $167,006 from Leading Edge and nonpassive income of $400,168 from Weekend Warrior for 2004.

On December 28, 2007, respondent issued a notice of deficiency to Weekend Warrior for 2002 and a notice of deficiency to Mr. Warmoth for 2002 and 2003. On April 21, 2008, respondent

---

[27]It is not clear whether the 2002 Form 1040 was timely filed. The 2003 and 2004 Forms 1040 were filed timely pursuant to extensions.

issued a notice of deficiency to Mr. Warmoth for 2004. The notices of deficiency issued to Mr. Warmoth included adjustments consistent with adjustments to the corporate returns from the examination of Weekend Warrior's Forms 1120S for 2003 and 2004 and the examination of Leading Edge's Forms 1120S for 2002-04.

With respect to Weekend Warrior's tax year 2002, respondent determined that $4,131,433 of the management fee deduction should be disallowed. Respondent calculated the adjustment to the management fee deduction using the section 482 principles. Respondent also adjusted forgone interest and ending inventory and disallowed depreciation and other deductions. With respect to the partial management fee deduction disallowance, respondent stated:

> The deduction had been adjusted to the amount verified.
>
> This item is not an allowable deduction.
>
> Because there is no business purpose for this transaction your deduction is denied.
>
> See Economist's Report Attached.
>
> Alternatively, Leading Edge Design, Inc. should be disregarded for Federal income tax purposes as Leading Edge Design, Inc. lacked both economic substance and economic purpose and was formed for the primary purpose of obtaining tax benefits.
>
> Transactions entered into between Leading Edge Design, Inc. and Weekend Warrior Trailers, Inc. should be disregarded for Federal income tax purposes. These transactions lacked economic substance and economic purpose and were entered into for primary purpose of obtaining tax benefits.

Respondent also determined that a section 6662(a) penalty applied. Specifically, respondent determined that section 6662(h) applied to the entire underpayment and calculated the amount of the penalty on the entire underpayment using the 40-percent rate.[28]

With respect to Mr. Warmoth's 2002 return, respondent adjusted income reported on Schedule E, Income or Loss From Partnerships and S Corporations, from Leading Edge by negative $4,132. Respondent also determined that in 2002 Mr. Warmoth received a $41,343 dividend. Respondent determined that a 20-percent penalty under section 6662(a) applied.

With respect to Mr. Warmoth's 2003 and 2004 returns, respondent made the following adjustments to Mr. Warmoth's Schedules E:[29]

---

[28]At the same time, however, the attachment to the notice of deficiency titled "200212-Adjustments Subject to Accuracy-Related Penalty-IRC 6662" indicates that only the underpayment resulting from the adjustment to the management fee deduction is attributable to a gross valuation misstatement. According to this attachment, the underpayment resulting from the remaining adjustments is attributable to negligence or disregard of rules or regulations. We address respondent's inconsistent penalty determination infra pp. 70-71.

[29]Respondent did not enumerate the adjustments to Weekend Warrior's return in the notices of deficiency issued to Mr. Warmoth but simply stated: "We adjusted your return in accordance with the examination results of the S corporation return (Form 1120S) of which you are a shareholder."

|  | Per return | Per exam | Adjustment |
|---|---|---|---|
| **2003** | | | |
| Leading Edge | $4,014 | $954 | ($3,060) |
| Weekend Warrior | 417,171 | 3,941,354 | 3,524,183 |
| **2004** | | | |
| Leading Edge | $167,006 | ($390,004) | ($222,998) |
| Weekend Warrior | 400,168 | 1,968,331 | 1,568,163 |

In the Forms 886-A, Explanation of Items, attached to Mr. Warmoth's notices of deficiency, respondent then stated that (1) "Leading Edge Design, Inc. should be disregarded for Federal income tax purposes as Leading Edge Design, Inc. lacked both economic substance and economic purpose and was formed for the primary purpose of obtaining tax benefits", and (2) "Transactions entered into between Leading Edge Design, Inc. and Weekend Warrior Trailers, Inc. should be disregarded for Federal Income tax" purposes because they lacked economic substance and economic purpose and were entered into for the primary purpose of obtaining tax benefits. Respondent calculated the adjustments to the management fee deductions for each year using the principles of section 482. Respondent also determined that Mr. Warmoth's underpayments were attributable to negligence or disregard of rules or regulations, substantial understatement of income tax, or substantial valuation misstatement and that a 20-percent accuracy-related penalty under section 6662(a) applied.

After the cases were calendared for trial, we continued the cases. After the cases were calendared for trial again,

respondent filed motions for leave to file an amendment to answer in each docket, which we granted. In the amendment to answer in docket No. 6984-08 respondent asserted an increased deficiency and the section 6662(a) penalty with respect to Weekend Warrior's 2002 return as follows:

|  | Notice of deficiency | Amendment to answer |
|---|---|---|
| Deficiency | $1,117,383 | $1,132,230 |
| Sec. 6662(a) penalty | 446,953 | 452,892 |

The increase in the deficiency results from respondent's determination to disallow the management fee deduction in full.[30] Accordingly, respondent's adjustments, as amended, to Weekend Warrior's Form 1120 for 2002 are as follows:

| Adjustment | Amount |
|---|---|
| Depreciation | $256,279 |
| Repairs and maintenance--aircraft | 40,199 |
| Other--insurance aircraft | 21,500 |
| Other deductions--aircraft fees | 614 |
| Other deductions--pilot | 5,657 |
| Management fees | 4,175,100 |
| Balance sheet--forgone interest | 41,343 |
| Cost of goods sold--ending inventory | 240,029 |
| Total | 4,780,721 |

In the amendment to answer respondent again calculated the section 6662(a) penalty using the 40-percent rate.

---

[30]Because in the notice of deficiency respondent had disallowed $4,131,433 of the management fee deduction, the additional disallowance of that deduction is $43,667 rather than $43,567, as respondent states in the amendment to answer.

In the amendments to answers in dockets Nos. 6997-08 and 15166-08 respondent asserted increased deficiencies and accuracy-related penalties with respect to Mr. Warmoth's 2003 and 2004 returns as follows:

|  | Notice of deficiency | Amendment to answer |
|---|---|---|
| **2003** | | |
| Deficiency | $1,252,944 | $1,862,245 |
| Sec. 6662(a) penalty | 250,589 | 372,449 |
| **2004** | | |
| Deficiency | 471,615 | 1,932,273 |
| Sec. 6662(a) penalty | 94,323 | 386,455 |

For both years the increased deficiencies result from respondent's determination to totally disallow the management fee deductions claimed on Weekend Warrior's 2003 and 2004 Forms 1120S.[31]

In the amendments to answers respondent asserted that Leading Edge should be disregarded for Federal income tax purposes because it lacked a legitimate business purpose and

---

[31]In the amendment to answer in docket No. 6997-08 respondent explained that in the notice of deficiency issued to Mr. Warmoth for 2003 he disallowed $3,059,142 of the design and marketing services fee and failed to disallow the remaining $1,740,858.  In the amendment to answer in docket No. 15166-08, respondent explained that in the notice of deficiency issued to Mr. Warmoth for 2004 he disallowed $490,946 of the design costs and marketing services fee deduction on Weekend Warrior's 2004 Form 1120S and failed to disallow the remaining $4,104,054. Because Weekend Warrior was an S corporation in 2003 and 2004, the adjustments affected Mr. Warmoth's returns.  See secs. 1363(a), 1366.

economic substance and was formed for the sole purpose of obtaining tax benefits.  Respondent also stated in the alternative that any agreements or transactions between Leading Edge and Weekend Warrior should be disregarded for Federal income tax purposes because they lacked a legitimate business purpose and economic substance and were entered into for the primary purpose of obtaining tax benefits.  Respondent also stated in the alternative that (1) the payments from Weekend Warrior to Leading Edge "were [not] paid or incurred in the ordinary and necessary course of business" under section 162, and (2) a redistribution or reallocation under section 482 is necessary to prevent the evasion of taxes or to clearly reflect income.

In the Forms 4549-B, Income Tax Examination Changes, attached to the amendments to answers in docket Nos. 6997-08 and 15166-08, respondent explained all adjustments to Weekend Warrior's 2003 and 2004 Forms 1120S as follows:

| Adjustment | 2003 | 2004 |
|---|---|---|
| Depreciation | $127,859 | $127,829 |
| Repairs and maintenance--aircraft | 27,600 | 27,600 |
| Other--insurance aircraft | 15,000 | 15,000 |
| Other deductions--aircraft fees | 429 | 429 |
| Other deductions--pilot | 3,947 | 3,947 |
| Management fees | 4,800,000 | 4,595,000 |
| Balance sheet--forgone interest | 69,256 | 117,356 |
| Cost of goods sold--ending inventory | 220,950 | 785,056 |
| Total adjustments | 5,265,041 | 5,672,217 |

OPINION

I.  Burden of Proof in General

Generally, the Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer bears the burden of proving that they are incorrect.  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Rule 142(a) provides:  "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court; and except that, in respect of any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer, it shall be upon the respondent."  In Shea v. Commissioner, 112 T.C. 183, 197 (1999), we stated:

> where a notice of deficiency fails to describe the
> basis on which the Commissioner relies to support a
> deficiency determination and that basis requires the
> presentation of evidence that is different than that
> which would be necessary to resolve the determinations
> that were described in the notice of deficiency, the
> Commissioner will bear the burden of proof regarding
> the new basis.  * * *

The allocation of the burden of proof in these cases is not a simple matter.  Bearing in mind the general principles stated above, we shall describe the burden of proof allocation as it pertains to specific adjustments in each relevant section below. Petitioners do not contend that section 7491(a) shifts the burden of proof to respondent, nor does the record establish that petitioners satisfy the section 7491(a)(2) requirements. Accordingly, section 7491(a) does not affect our conclusions.

II.  The Management Fee Deductions

    A.  Statutory Background

Generally, an S corporation is defined as a small business corporation for which an election under section 1362(a) is in effect for such year.  Sec. 1361(a)(1).  An S corporation is not subject to Federal income taxes.  Sec. 1363(a); see also Taproot Admin. Servs., Inc. v. Commissioner, 133 T.C. 202, 204 (2009).  Like a partnership, an S corporation is a conduit through which income flows to its shareholders, resulting in only one level of taxation.  See Taproot Admin. Servs., Inc. v. Commissioner, supra at 204 (quoting Gitlitz v. Commissioner, 531 U.S. 206, 209 (2001)).  The passthrough taxation system applicable to S corporations includes detailed eligibility rules at both the corporate and shareholder levels.  See, e.g., sec. 1361(b)-(d).  Some of the eligibility rules are incorporated into the definition of small business corporation.  See sec. 1361(b)(1).

In 1996 Congress expanded the definition of a small business corporation to allow certain tax-exempt organizations to own S corporation stock.  See Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1316(a), 110 Stat. 1785; see also Taproot Admin. Servs., Inc. v. Commissioner, supra at 205.  Section 1361(c)(6) now permits qualified pension, profit-sharing, and stock bonus plans (within the meaning of section 401(a)) and exempt organizations (within the meaning of section 501(a) and

(c)(3)) to hold S corporation stock.  See also <u>Taproot Admin.
Servs., Inc. v. Commissioner</u>, <u>supra</u> at 205 n.5.  In expanding the
list of eligible shareholders in this manner, Congress intended
to encourage employee ownership of closely held businesses and to
facilitate the establishment of ESOPs by S corporations.  S.
Rept. 104-281, at 60-61 (1996); see also S. Prt. 107-30, at 123
(2001).  As a consequence of ESOPs' holding shares in S
corporations, S corporation profits may generally escape current
taxation.[32]

In some circumstances, however, the expanded eligible
shareholder rules resulted in inappropriate tax deferral.[33]  To

---

[32]In 1997 Congress enacted other provisions affecting
taxation of S corporations.  See, e.g., Taxpayer Relief Act of
1997, Pub. L. 105-34, sec. 1523(a), 111 Stat. 1070-1071 (amending
sec. 512(e) to repeal the application of the unrelated business
income tax to ESOPs for years beginning after Dec. 31, 1997).

[33]In <u>United States v. Stover</u>, 731 F. Supp. 2d 887, 891, 895
(W.D. Mo. 2010) (an action under sec. 7408), the court described
the transaction in which

> a business owner [formed] a separate business
> denominated as a management company.  The "operating
> company"--the initial, pre-existing business--retains
> the new company to perform "management services."  Fees
> paid to the management company are expenses that reduce
> the operating company's taxable income.  * * *
>
> *     *     *     *     *     *     *
>
> In this structure, the management company was an S
> corporation.  The management company then formed an
> ESOP, which owned the management company's stock.  The
> same person or persons who owned the operating and
> managing companies were also the only beneficiaries of

(continued...)

address concerns about ownership structures involving S

corporations and ESOPs, in 2001 Congress added section 409(p).

See Economic Growth and Tax Relief Reconciliation Act of 2001,

Pub. L. 107-16, sec. 656(a), 115 Stat. 131.  For ESOPs created

after March 14, 2001, section 409(p) was effective for plan years

ending after March 14, 2001.  See id. sec. 656(d), 115 Stat. 135.

Section 409(p) is intended to limit the tax benefits of ESOPs

maintained by S corporations to situations where the ESOP

provides meaningful benefits to rank-and-file employees.  See S.

Prt. 107-30, supra at 123-124.  The legislative history explains:

> the Committee has become aware that the present-law
> rules allow inappropriate deferral and possibly tax
> avoidance in some cases.
>
> The Committee continues to believe that S corporations
> should be able to encourage employee ownership through
> an ESOP.  The Committee does not believe, however, that
> ESOPs should be used by S corporation owners to obtain
> inappropriate tax deferral or avoidance.
>
> Specifically, the Committee believes that the tax
> deferral opportunities provided by an S corporation
> ESOP should be limited to those situations in which
> there is broad-based employee coverage under the ESOP

---

[33](...continued)
the ESOP.  The management fees paid by the operating
company obtained an indefinite deferral:  the income to
the management company was not taxed because it made an
election under subchapter S, and an ESOP's income is
not subject to taxation.  Thus, the operating company
gains a deduction in the amount of the management fees,
and those fees are not taxed until money is distributed
from the ESOP.  [Fn. ref. omitted.]

and the ESOP benefits rank-and-file employees as well as highly compensated employees and historical owners.

Id.

Under section 409(p)(1), an ESOP holding employer securities consisting of stock in an S corporation must provide that no portion of the assets of the plan attributable to (or allocable in lieu of) such employer securities may, during a nonallocation year, accrue (or be allocated directly or indirectly) for the benefit of any disqualified person.  If a plan fails to meet these requirements, it is treated as having distributed to any disqualified person the amount allocated to the account of such person.  See sec. 409(p)(2).  A nonallocation year occurs when disqualified persons own at least 50 percent of the number of shares of stock in the S corporation.  Sec. 409(p)(3).  Whether an owner is a disqualified person depends on a person's deemed-owned shares of S corporation stock held by an ESOP.  Under section 409(p)(4), a person is a disqualified person if that person is either (1) a member of a deemed 20-percent shareholder group, or (2) a deemed 10-percent shareholder.

B.   Deductions at Issue and Respondent's Arguments

Respondent is not challenging the employee leasing fee deductions that Weekend Warrior reported.  Rather, he disallowed the deductions for management fees, which Weekend Warrior reported under the categories "Management Fees" for 2002, "Design and Marketing Services" for 2003, and "Designer Costs" and

"Marketing Services" for 2004. Because under the management agreement Weekend Warrior paid Leading Edge for design, management, and personnel services, we understand that respondent challenged only the deductions claimed for payments under the design and management portions of the agreement.

As for the grounds for the disallowance, in the opening brief respondent repeats his position in the amendments to answers, which is described above. See supra pp. 33-36. In his reply brief respondent also argues that the sale of Leading Edge stock to the retirement plan lacked a business purpose. Respondent contends that establishing the retirement plan as an incentive for the employees was not the true purpose of the structure. Respondent points to the short lifespan of the retirement plan and the fact that as soon as the changes to section 409 made the ESOP arrangement less appealing from a tax standpoint, the retirement plan's shares were redeemed and Mr. Warmoth became Leading Edge's sole shareholder.

As a general rule, the Court will not consider issues first asserted on brief. See Sundstrand Corp. & Subs. v. Commissioner, 96 T.C. 226, 346-349 (1991). When issues are presented in the reply brief only, there is an even stronger reason to disregard them. See Estate of Sparling v. Commissioner, 60 T.C. 330, 350 (1973), revd. on another issue 552 F.2d 1340 (9th Cir. 1977).

Accordingly, we shall not consider whether the sale of Leading Edge stock to the retirement plan lacked a business purpose.

C.   Burden of Proof Issues

Generally, deductions are a matter of legislative grace, and the taxpayer must show that he or she is entitled to any deduction claimed.  Rule 142(a); Deputy v. du Pont, 308 U.S. 488, 493 (1940).  In the amendments to answers respondent asserted increased deficiencies for 2002 with respect to Weekend Warrior and for 2003 and 2004 with respect to Mr. Warmoth.  As described above, the increased deficiencies are attributable solely to full rather than partial disallowance of the management fee deductions.  Under Rule 142(a) respondent bears the burden of proof in respect to the increases in deficiency as follows:  (1) $43,567 of the management fee deduction Weekend Warrior claimed for 2002; and (2) $1,740,858 and $4,104,054 of the design and marketing services deductions Weekend Warrior claimed for 2003 and 2004, respectively.

Petitioners do not contend that section 162 constitutes a new matter that affects the burden of proof allocation, see Shea v. Commissioner, 112 T.C. at 197, and we conclude it is not.  The notice of deficiency issued to Weekend Warrior for 2002 is broadly worded ("This item is not an allowable deduction.").  In the amendment to answer respondent cited section 162, which is not inconsistent with the language in the notice of deficiency,

and accordingly, the assertion of section 162 does not constitute a new matter. See <u>Abatti v. Commissioner</u>, 644 F.2d 1385 (9th Cir. 1981), revg. T.C. Memo. 1978-392; <u>Achiro v. Commissioner</u>, 77 T.C. 881, 890 (1981). For 2003 and 2004 (as well as 2002) the section 162 argument requires evidence that is generally consistent with the grounds for disallowance proffered in the notices of deficiency, such as economic substance and sham entity. Accordingly, the section 162 argument does not constitute a new matter.[34] See <u>Shea v. Commissioner</u>, <u>supra</u> at 197; <u>Achiro v. Commissioner</u>, <u>supra</u> at 890.

D.   <u>Deductibility of the Management Fees</u>

We now address the deductibility of the management fees.

1.   <u>Sham Entity</u>

Relying on <u>Moline Props., Inc. v. Commissioner</u>, 319 U.S. 436 (1943), respondent contends that Leading Edge should be disregarded for Federal income tax purposes because it lacked a legitimate business purpose and economic substance and was formed for the sole purpose of obtaining tax benefits. Respondent argues that Mr. Warmoth was motivated by a desire to reduce Weekend Warrior's taxable income and that the incorporation of Leading Edge was merely an accounting arrangement to funnel income away from Weekend Warrior. Respondent contends that the

_____

[34]We do not address whether the sec. 482 argument constituted a new matter with respect to any year because we do not resolve the management fee issue on the grounds of sec. 482.

structure allowed Weekend Warrior to claim management fee deductions without incurring real costs because Leading Edge then lent money to Weekend Warrior.  Respondent also argues that Leading Edge did not carry on business activity after it was formed because it had only one client, that Mr. Warmoth's design work did not change, that the invoices for management services do not describe what work was done or who performed it, and that Leading Edge performed no functions that Weekend Warrior had not performed before Leading Edge's creation.

Generally, "a taxpayer may adopt any form he desires for the conduct of his business and * * * the chosen form cannot be ignored merely because it results in a tax saving." Bass v. Commissioner, 50 T.C. 595, 600 (1968); see also Aldon Homes, Inc. v. Commissioner, 33 T.C. 582, 596-597 (1959).  However, to be respected, the form the taxpayer chooses must be a viable business entity.  In Moline Props., Inc. v. Commissioner, supra at 438-439, the Supreme Court observed:

> Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.  [Fn. refs. omitted.]

See also Bass v. Commissioner, supra at 600-601; Aldon Homes, Inc. v. Commissioner, supra at 596-597.

Petitioners proffer several potentially legitimate business reasons for incorporating Leading Edge. Petitioners suggest that they were motivated by the desire to establish an incentive plan for rank-and-file employees. Several witnesses testified that the purpose of the plan was to provide equity ownership as a performance incentive for employees and to encourage employees to remain with the company. However, viewing the ESOP through the lens of the deferred compensation plan that benefited solely Mr. Warmoth casts doubt that the benefits to rank-and-file employees were more than minimal. This reason also appears questionable in the light of Mr. Warmoth's testimony that in 2004 Leading Edge repurchased the shares because "the Government had changed the law and it was not a good deal anymore."

Petitioners also claim the rapid business growth was a reason for incorporating Leading Edge. The record shows that Weekend Warrior was experiencing significant sales growth at the time the ESOP was established, with gross sales increasing from $18.7 million in 2000 to $24.3 million in 2001. Mr. Mitchellweiler testified that it was projected Weekend Warrior would have divisions and subsidiaries and that it became apparent that centralizing management would create efficiencies. Under the plan Leading Edge would take all employees and lease them to various related entities that would be formed in the future. The employees would be able to contract with multiple entities from a

single source. According to Mr. Warmoth, the reorganization would allow Leading Edge to handle some of the responsibilities that Mr. Warmoth had previously handled. It was accomplished by moving certain operations from Weekend Warrior to Leading Edge; Weekend Warrior would remain the manufacturing entity.

The record contains no credible evidence, however, that any additional divisions were organized in years after 2001, despite sales of $43.7 million, $67.9 million, and $85.9 million in 2002, 2003, and 2004, respectively. There is no credible evidence in the record that the new structure allowed Weekend Warrior to achieve cost savings or efficiencies or that it resulted in any meaningful changes in business operations.

Petitioners suggest that isolating manufacturing liability and protecting value were additional reasons for incorporating Leading Edge. Mr. Warmoth was concerned about product liability in particular given that at some point before 2002, Weekend Warrior had become involved in a personal injury lawsuit.[35] A wheel came off a trailer, went onto incoming traffic, and injured a person. Mr. Warmoth's team of advisers believed that shifting value away from Weekend Warrior was desirable from a product liability standpoint. Yet no credible evidence in the record corroborates petitioners' proffered theory. Petitioners do not

[35]The plaintiffs also sued Mr. Warmoth, the chassis company, the dealer, the tire company, the rim company, and the axle company.

claim they considered additional liability insurance or evaluated whether the corporate shield of Leading Edge would have practical significance in case of a lawsuit.  Cf. Aldon Homes, Inc. v. Commissioner, supra at 597-598.

Even if a corporation was not formed for a valid business purpose, it nevertheless must be respected for tax purposes if it actually engaged in business activity.  See Moline Props., Inc. v. Commissioner, 319 U.S. at 438-439; Bass v. Commissioner, supra at 602.  The prongs of the test under Moline Props. are alternative prongs.  See Moline Props., Inc. v. Commissioner, supra at 438-439; Bass v. Commissioner, supra at 602; see also Rogers v. Commissioner, T.C. Memo. 1975-289 ("Moline establishes a two-pronged test, the first part of which is business purpose, and the second, business activity.  * * *  Business purpose or business activity are alternative requirements.").  Accordingly, the issue turns on whether Leading Edge engaged in business activity.  Whether a corporation is carrying on sufficient business activity to require its recognition as a separate entity is a question of fact.  Bass v. Commissioner, supra at 602 (status of a corporation respected when testimony established that "the corporation was managed as a viable concern, and not as simply a lifeless facade.")

On this record we decline to hold that Leading Edge was a "lifeless facade".  See id.  Leading Edge provided personnel

services to Weekend Warrior. It maintained an investment account and bank accounts. It paid its employees by check, adopted a retirement plan, which respondent does not timely argue was a sham, kept books and records, and engaged Mr. Baily to appraise its stock. Leading Edge invested excess funds and at least from August 2003 through December 2004 purchased and sold stocks and received dividends. Corporate formalities were followed. Leading Edge filed Federal income tax and employment tax returns. We conclude Leading Edge carried on sufficient business activity to be recognized for Federal income tax purposes. See id. at 602.

### 2. Section 162

Respondent argues that the management fees are not deductible under section 162. He concedes the expenses were ordinary but contends the payments to Leading Edge were not necessary or reasonable. We agree.

Generally, section 162 permits the taxpayer to deduct all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. An expense is necessary if it is helpful or appropriate to the taxpayer's business. Welch v. Helvering, 290 U.S. at 113. To be necessary, the expense does not need to be absolutely essential. See id. For an expense to be considered ordinary and necessary, it must be reasonable in amount. United States v. Haskel Engg. & Supply

Co., 380 F.2d 786, 788-789 (9th Cir. 1967) (citing Commissioner v. Lincoln Electric Co., 176 F.2d 815, 817 (6th Cir. 1949), revg. a Memorandum Opinion of this Court). Only the portion of the expense that is reasonable qualifies for a deduction under section 162(a). United States v. Haskel Engg. & Supply Co., supra at 788-789.

Respondent is not challenging the deductibility of the employee leasing fees Weekend Warrior paid, so we focus our analysis only on the services that Leading Edge purportedly provided under the management and design portions of the management agreement. Whether the fees were reasonable and necessary depends on what services Leading Edge actually performed (as opposed to what the management agreement provided it would perform). The record, however, is sparse as to the details of the parties' actual relationship. Leading Edge issued no invoices to Weekend Warrior for 2003 and 2004. Of the four invoices that Leading Edge issued for 2002, two predate the incorporation of Leading Edge, raising questions regarding the genuineness of the other two invoices as well. The invoices contain only a general description "Management Fee".

The record is also sparse regarding the identity of the persons who allegedly supplied services on behalf of Leading Edge under the management agreement. On the basis of the record as a whole, we find that besides Mr. Warmoth, the top managers Messrs.

Hansen, Stoap, and Denton could have provided some services that might fall under the management agreement umbrella. Mr. Hansen testified at trial, but his testimony did not explain how his duties were divided between his employment with Weekend Warrior and his work on Leading Edge's behalf under the management agreement. The record is devoid of any credible evidence regarding other top managers' jobs after 2002. In 2003 Messrs. Stoap and Denton received wages from Leading Edge only, leading to an inference that they performed all their work under the management agreement. With no credible evidence as to Messrs. Stoap's and Denton's jobs or the actual services they performed, however, we are unable to find that they provided any services under the management agreement.

The record with respect to Mr. Warmoth's services and responsibilities is a bit more substantial. Mr. Warmoth testified that his duties were split between the companies after Leading Edge was organized. He testified also that after the creation of Leading Edge his job consisted of obtaining reports from the companies and managing vice presidents rather than being involved in details. However, the record contains no details as to what exactly Mr. Warmoth did under the management agreement. When asked about the purpose of the management agreement, Mr. Warmoth testified: "It's where we drew the line on what the responsibilities were from the manufacturing side of the company

and the management or the Leading Edge Designs side of the company. * * * It was--it was more a by-law than an agreement. It said, Here's what we're gonna do for this fee and separated the companies then." Counsel then asked Mr. Warmoth what he did through Leading Edge and under the management agreement. Mr. Warmoth answered:

> A: I don't know specifically. I probably can--I know it had to do with managing the employees and managing the integral parts of the companies * * * So we separated the operation into Leading Edge Designs and the manufacturing facility so at that point I was still doing the most important thing, which was the design of the trailers, the concept of the whole company, and the flavor of the whole company through some marketing but mostly managing the vice presidents at that point to make sure that they're watching over the multiple factories that we had started to acquire.
>
> Q: And you did that at that point through Leading Edge Design?
>
> A: Correct.

Mr. Warmoth then testified that Leading Edge handled the labor, the material control, the quality control, the shipment of the units, and the morale of the employees. The labor issues aside (because leasing fees are not at issue), Mr. Warmoth's testimony was not corroborated by other credible evidence regarding any changes in operations, such as material control, quality control, or product shipment.

Mr. Warmoth's general and vague testimony and the lack of credible evidence regarding specifics of the companies' operations are products of a fuzzy dividing line, if any, between

Leading Edge and Weekend Warrior.  Because the record is vague as to what specific services Leading Edge performed for Weekend Warrior under the management agreement and who exactly performed those services, we cannot conclude that the fees for those undefined and unquantified services were necessary or reasonable.

Petitioners submitted to the Court an expert report dated February 27, 2008, prepared by Mr. Baily, whom petitioner called as an expert witness at trial.  In his report Mr. Baily concludes that fees under the management agreement as of December 20, 2002, were reasonable.  We did not find Mr. Baily's report helpful because Mr. Baily prepared it as of December 20, 2002, at the outset of the relationship between Leading Edge and Weekend Warrior.  According to the letter from Mr. Baily to Mr. Warmoth accompanying the report, the effective date of the analysis was December 20, 2002, and "The value determined herein is based upon information that was reasonably available as of that date and does not incorporate events that occurred or information that became available subsequent" to December 20, 2002.  As discussed above, the record does not allow us to conclude that Leading Edge performed the services envisioned by the management agreement.  Accordingly, any valuation of the fees that does not take into account the actual relationship of the parties is speculative at best for the purpose of determining whether the management fee

deductions Weekend Warrior claimed on the 2002-04 returns were reasonable.

Neither party carried its respective burden of proof on the issue of the deductibility of the management fees.  Given the allocation of the burden of proof discussed above, we sustain respondent's adjustments to the management fee deductions in the amounts determined in the notices of deficiency.  Because respondent did not carry his burden of proof regarding the additional deficiencies attributable to the total disallowance of the management fee deductions, we also hold that petitioners are not liable for the additional deficiencies asserted in the amendments to answers.

III. <u>Depreciation Deductions</u>

A.    <u>Burden of Proof Issues</u>

With respect to the burden of proof for other adjustments, such as depreciation and airplane expenses, the general principle that deductions are a matter of legislative grace and the taxpayer bears the burden of proof, applies.  See <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).  Petitioners do not contend that the burden of proof with respect to these adjustments shifts to respondent.

B.    Deductions Under Sections 167 and 168(a)

1.    In General

Generally, section 167(a) allows a deduction for a reasonable allowance for the exhaustion, wear and tear, and obsolescence of property used in a trade or business or held for the production of income.  Pursuant to section 168(a), taxpayers determine such deduction by using the applicable depreciation method, applicable convention, and the applicable recovery period.  Section 274(a)(1)(A) generally disallows deductions, otherwise allowable under the Code, involving entertainment, amusement, or recreational activities, unless the taxpayer establishes that the item was directly related to or associated with the active conduct of the taxpayer's trade or business. Section 274(a)(1)(B) generally disallows deductions incurred with respect to a facility used in connection with such entertainment activities.  Section 274 does not define the term "facility", but according to the legislative history, the term includes any item of real or personal property which is owned, rented, or used by a taxpayer in conjunction or connection with an entertainment facility, such as airplanes and yachts.  See H. Conf. Rept. 95-1800, at 249 (1978), 1978-3 C.B. (Vol. 1) 521, 583; S. Rept. 95-1263, at 174-175 (1978), 1978-3 C.B. (Vol. 1) 315, 472-473.

Section 274(d) requires the taxpayer to substantiate by adequate records or by sufficient evidence corroborating the

taxpayer's own statement any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement or recreation, or with respect to a facility used in connection with entertainment activity. Section 274(d)(4) also disallows any deduction otherwise allowable under, inter alia, sections 167 and 168 with respect to any "listed property" unless the taxpayer satisfies the substantiation requirements of that section. "Listed property" is defined in section 280F(d)(4) to include any property used as a means of transportation. Sec. 280F(d)(4)(A)(ii). Section 1.280F-6(b), Income Tax Regs., includes boats and airplanes as a means of transportation.

To substantiate a deduction under section 274, a taxpayer must maintain adequate records or present sufficient evidence corroborating the taxpayer's statement as to the following elements: (1) The amount of the expense, (2) the time and place of the travel, recreation, or use of the property, (3) the business purpose of the expense, and (4) the business relationship to the taxpayer of persons entertained or using the facility or property. Sec. 274(d); sec. 1.274-5T(a), (c)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46006, 46016 (Nov. 6, 1985). To meet the adequate records requirements of section 274(d), a taxpayer must maintain an account book, a log, or other documentary evidence which, in combination, is sufficient to

establish each element of an expenditure or use. Sec. 1.274-5T(c)(2), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985). To constitute an adequate record that substantiates business or investment use of listed property, the taxpayer's record must contain sufficient information as to each element of every business or investment use. Sec. 1.274-5T(c)(2)(ii)(C)(1), Temporary Income Tax Regs., 50 Fed. Reg. 46018 (Nov. 6, 1985).

If the taxpayer fails to comply with the adequate records requirements with respect to an element of the expenditure or use, the taxpayer must establish that element by his own statement containing specific information in detail as to each element, including business use, and by other corroborative evidence sufficient to establish the element. See sec. 1.274-5T(c)(3)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46020 (Nov. 6, 1985). As explained below, petitioners failed to substantiate the business use of the airplane and boat in excess of that allowed by respondent.

### 2. The Airplane

Respondent determined that Weekend Warrior used the airplane for business 14 percent in 2002 and 40 percent in 2003 and 2004. Respondent thus partially disallowed depreciation deductions with respect to the airplane on the ground that Weekend Warrior failed

to establish business use of the airplane and failed to meet the strict substantiation requirements.[36]  We agree.

The record contains accounting flight logs for 2002 and pilot flight logs for each year at issue, but these logs do not list any business purposes for the flights.  The parties stipulated that during 2002-04 Mr. Warmoth did not maintain a contemporaneous mileage log that described the purposes of the flights.[37]  Accordingly, Weekend Warrior fails to satisfy the adequate records requirements of section 274(d) with respect to the airplane.

Petitioners introduced into evidence a list of the people who allegedly flew on the airplane and their alleged business relationships, which Mr. Warmoth created from memory in 2007.  Mr. Warmoth's list shows names of individuals and the number of times each individual was flown on the airplane but fails to list or explain the business purpose for each airplane use.  Mr. Warmoth testified that the airplane was used for entertaining dealers, customers, and employees, and "it was part of our

---

[36]Petitioners suggest in their reply brief that respondent conceded depreciation deductions with respect to the airplane. Respondent does address lack of substantiation for the claimed depreciation deductions in his reply brief, and therefore we address it.

[37]Mr. Warmoth testified that Mr. Espera was responsible for documenting flights for tax purposes.  After every trip Mr. Espera met with Mr. Warmoth and the pilot to obtain information on the destination and the people involved.  The records, however, could not be found.

lifestyle". Mr. Warmoth also testified that Weekend Warrior organized "jamborees", such as river rafting trips for 60 to 70 people. According to Mr. Warmoth, the airplane was a tool for organizing such rafting outings more efficiently.

Such general testimony is insufficient to meet the strict substantiation requirements of section 274(d). We conclude that Weekend Warrior failed to substantiate the business use of the airplane by other sufficient evidence and is not entitled to depreciation deductions with respect to the airplane beyond those respondent already allowed.

### 3. The Boat

Respondent disallowed in full depreciation deductions with respect to the boat. The parties stipulated that Weekend Warrior did not maintain a contemporaneous log regarding the boat's business use. Mr. Warmoth testified that the boat was a river boat for the Colorado River where Mr. Warmoth had an entertainment house, and he entertained there almost every weekend in both summer and winter. According to Mr. Warmoth, it was used, like the airplane, for entertaining dealers, customers, and employees. The marine purchase agreement, however, provides that "Mark Warmoth (Weekend Warrior)" was the purchaser and lists Mr. Warmoth's address in California.

Mr. Warmoth's general testimony falls short of that required to satisfy the strict substantiation requirements of section

- 60 -

274(d).  We conclude that the record does not satisfy the
adequate records requirement of section 274(d) and is
insufficient to allow us to conclude that the boat was used for
business purposes.

Petitioner contends, however, that the record shows that the
boat was used at least 50 percent for business purposes and that
the incidental use exception of section 1.274-2(e)(4)(iii)(a),
Income Tax Regs., applies.  We disagree.  The record does not
allow us to conclude that the boat was used at least 50 percent
for business purposes, and we conclude that the exception does
not apply.  We also note that the boat qualifies as listed
property, for which no deduction is allowed unless the taxpayer
meets strict substantiation requirements with respect to the
property.  Weekend Warrior failed to substantiate the business
use of the boat by adequate records or sufficient evidence.
Accordingly, Weekend Warrior may not deduct expenses relating to
the boat.

C.   Deduction Under Section 168(k) for 2002

For 2002 Weekend Warrior claimed a special depreciation
deduction of $160,000 under section 168(k) with respect to the
airplane.  Respondent contends that Weekend Warrior was not
eligible for a special depreciation deduction under section
168(k).

- 61 -

As discussed above, Weekend Warrior is not entitled to the disputed depreciation deduction because it did not satisfy the substantiation requirements of section 274(d).  However, even if Weekend Warrior had met the section 274(d) requirements, it would not be entitled to the special depreciation deduction under section 168(k).

Congress enacted section 168(k) as part of the Job Creation and Worker Assistance Act of 2002, Pub. L. 107-147, sec. 101(a), 116 Stat. 22, to allow an additional first-year depreciation deduction.  The additional depreciation deduction is equal to 30 percent of the adjusted basis of qualified property.  See id. Qualified property is defined as property that meets all of the following requirements:  (1) The property is modified accelerated recovery system property with an applicable recovery period of 20 years or less (unless an exception not relevant is applied); (2) the original use of the property commenced with the taxpayer after September 10, 2001; (3) the taxpayer acquired the property within a certain period; and (4) the taxpayer placed the property in service before specified dates.  Id.

The "original use" requirement is at issue here. Petitioners contend that the airplane was original property to Weekend Warrior in 2002 because it was the first use to which the airplane was put by Weekend Warrior.  We disagree.  For the purposes of section 168(k), original use means the first use to

which the property is put.  See S. Rept. 107-49, at 5 n.7 (2001),
2002-3 C.B. 180, 186; H. Rept. 107-251, at 20 n.2 (2001), 2002-3
C.B. 44, 63; see also January Transp., Inc. v. Commissioner, T.C.
Memo. 2008-268.  The record contains documents related to the
purchase of the 1994 airplane.  The documents establish that
Weekend Warrior purchased a used rather than a new airplane.  For
example, the airplane is described as "beautiful condition", "2-
owner", "no damage history".  Moreover, petitioners do not deny
in their reply brief that Weekend Warrior acquired a used
airplane.  Accordingly, Weekend Warrior is not entitled to the
section 168(k) special depreciation deduction with respect to the
airplane for 2002.

IV.  Airplane Expenses

For each year at issue Weekend Warrior deducted expenses
related to repairs and maintenance of the airplane, insurance
costs, aircraft fees, and pilot expenses.  Respondent argues that
these expenses are not deductible on the ground of lack of
substantiation.  We agree.

Section 162 allows taxpayers to deduct "ordinary and
necessary" business expenses provided they establish that each
expense claimed was paid or incurred in carrying on a trade or
business.  Section 274(d)(4) disallows any deduction otherwise
allowable under, inter alia, section 162, with respect to any
"listed property" unless the taxpayer satisfies the

substantiation requirements of that section.  As discussed above, the airplane is listed property.  See sec. 280F(d)(4)(A)(ii); sec. 1.280F-6(a)(1), Income Tax Regs.

Weekend Warrior did not provide any receipts or other credible evidence to substantiate the amount of the expenses.  As discussed above, other than Mr. Warmoth's general testimony regarding the business use of the airplane for entertaining, which was simply not adequate to satisfy the detailed section 274 substantiation requirements, Weekend Warrior presented no evidence regarding its business use.  Accordingly, Weekend Warrior is not entitled to deduct the airplane expenses.

V.   Forgone Interest and Constructive Dividend

Respondent determined that Weekend Warrior had forgone interest income of $41,343, $69,256, and $117,356 for 2002, 2003, and 2004, respectively, under section 7872.  Respondent relies on Weekend Warrior's Schedules L to support his determination.  The Schedules L show that Weekend Warrior reported loans to a shareholder of $1,205,325, $2,019,153, and $3,421,458 for 2002, 2003, and 2004, respectively.  Because of the mechanics of section 7872 discussed below, the forgone interest determination also resulted in a determination that for 2002 Mr. Warmoth, as Weekend Warrior's sole shareholder, received a $41,343 constructive dividend.

At trial and on brief respondent claimed that (1) for 2002 Weekend Warrior's forgone interest equals $39,896 rather than $41,343[38] as determined in the notice of deficiency; (2) for 2003 Weekend Warrior's forgone interest equals $71,680 rather than $69,256 as determined in the notice of deficiency; and (3) for 2004 Weekend Warrior's forgone interest equals $122,138 rather than $117,356 as determined in the notice of deficiency.[39]

Generally, section 7872 recharacterizes a below-market loan as an arm's-length transaction in which the lender makes a loan to the borrower in exchange for a note requiring the payment of interest at a statutory rate. As a result, the parties are treated as if the lender made a transfer of funds to the borrower and the borrower used these funds to pay interest to the lender. The transfer to the borrower is treated as a gift, dividend, contribution of capital, payment of compensation, or other payment depending on the substance of the transaction. Section 7872 applies to a transaction that is a loan subject to a below-market interest rate and is described in one of several enumerated categories. Sec. 7872(c)(1), (e)(1), (f)(8). One of

---

[38]We treat respondent's position with respect to 2002 as a concession. See supra note 3.

[39]As stated above, the notices of deficiency issued to Mr. Warmoth for 2003 and 2004 provided only the totals of adjustments to Weekend Warrior's returns. Petitioner correctly notes that such notices of deficiency are "unhelpful".

the categories is a loan between a corporation and any of its shareholders.  Sec. 7872(c)(1)(C).

To determine whether the below-market loan took place, we consider whether the loan was a demand or term loan and whether it was subject to a below-market interest rate.  See sec. 7872(e)(1); KTA-Tator, Inc. v. Commissioner, 108 T.C. 100, 103 (1997).  A demand loan includes "any loan which is payable in full at any time on the demand of the lender."  Sec. 7872(f)(5). A term loan is "any loan which is not a demand loan."  Sec. 7872(f)(6).  The determination of whether a loan is a demand loan or a term loan is a factual one.  See KTA-Tator, Inc. v. Commissioner, supra at 104.  Loans between closely held corporations and their controlling shareholders are subject to special scrutiny.  Id.

We first address the question of the burden of proof.  The determinations of forgone interest and constructive dividend are determinations of unreported income.  The Court of Appeals for the Ninth Circuit, to which an appeal would lie absent a stipulation to the contrary, see sec. 7482(b)(1)(A), has held that for the presumption of correctness to attach to the notice of deficiency in unreported income cases, the Commissioner must establish "some evidentiary foundation" connecting the taxpayer with the income-producing activity, see Weimerskirch v. Commissioner, 596 F.2d 358, 361-362 (9th Cir. 1979), revg. 67

- 66 -

T.C. 672 (1977), or demonstrating that the taxpayer actually received unreported income, Edwards v. Commissioner, 680 F.2d 1268, 1270-1271 (9th Cir. 1982). If the Commissioner introduces some evidence that the taxpayer received unreported income, the burden shifts to the taxpayer, who must establish by a preponderance of the evidence that the deficiency was arbitrary or erroneous. See Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), affg. T.C. Memo. 1997-97.

With respect to the interest income determination for Weekend Warrior's 2002-04 returns, respondent introduced evidence of an income-producing activity. In particular, respondent introduced evidence that Weekend Warrior reported loans to shareholders as assets on Schedules L. Accordingly, the presumption of correctness attached to respondent's determinations, and petitioners bear the burden of proof with respect to unreported interest income on a below-market rate loan (1) for 2002 of $39,896 as per the amendment to answer for that year, and (2) for 2003 and 2004 as determined in the notices of deficiency and clarified in the amendments to answers for those years. The $2,424 and $4,781 increases in the adjustments to forgone interest for 2003 and 2004, respectively, that respondent asserted at trial produce increases in deficiencies, and respondent bears the burden of proof with respect to these increases. See Rule 142(a).

With respect to the constructive dividend determination, respondent introduced evidence that Mr. Warmoth had an income-producing activity in that he was a shareholder of Weekend Warrior. Accordingly, the burden of proof shifted to petitioners to prove that respondent's adjustments with respect to unreported constructive dividend income in the notice of deficiency issued to Mr. Warmoth for 2002 were incorrect. Consequently, petitioners bear the burden of proof and the burden of production with respect to the adjustment to dividend income for 2002.

Petitioners do not deny the existence of the loans and argue only that the loans were not below market rate. However, for 2002 and 2003 petitioners presented no evidence to refute respondent's determination that the shareholder loans were below-market-rate loans. Accordingly, we sustain respondent's determination that Weekend Warrior has forgone interest income of $39,896 and $71,680 for 2002 and 2003, respectively.

The foregoing conclusion results in the corollary conclusion that in 2002 Mr. Warmoth had constructive dividend income of $39,896.[40] Petitioners do not rely on any facts or legal principles to contest respondent's constructive dividend determination, and petitioners argue only that respondent failed to prove by any fact or document in the record that Mr. Warmoth

_____

[40]Because of the mechanics of sec. 7872, the amount of the constructive dividend differs from respondent's determination of $41,342 in the notice of deficiency.

had received a constructive dividend.  Petitioners forget that they bear the burden of proof with respect to the constructive dividend adjustment.  See Rule 142(a).  Petitioners failed to carry it.

However, we do not agree with respondent that the 2004 Schedule L shows the correct amount of loans to Mr. Warmoth for 2004.  Petitioners introduced into evidence, albeit without pointing to the relevant postings, Weekend Warrior's general ledgers for 2004.  We understand that on the 2004 Schedule L Weekend Warrior reported the shareholder loans on the basis of the total of the ending balances of accounts titled "Officer Receivable" ($2,311,458) and "Account Receivable--Warmoth" ($1,110,000) for 2004.  Under these accounts, however, Weekend Warrior recorded loans and advances to various individuals and companies, in addition to Mr. Warmoth.  For example, the account "Account Receivable--Warmoth" shows journal postings of loans to National RV Holdings, Inc., LEDI Services, Inc., and others.  Only one posting of a $500,000 loan in that account was to Mr. Warmoth.  The $500,000 loan is further corroborated by Promissory Note #3 dated October 31, 2004.  The $500,000 loan carried an annual interest rate of 5 percent, and we therefore disregard that loan in our section 7872 analysis.  The journal account titled "Officer Receivable" shows postings of only two loans to Mr. Warmoth that total $16,250 for the period January 1 through

June 30, 2004, and $7,300 for the period July 1 through December 31, 2004.

However, the record also contains a copy of a check dated December 30, 2004, drawn on Mr. Warmoth's account for $1,249,149. The memorandum line on the check reads "loan * * * 6138". According to a handwritten note below the copy of the check, the check was for loan repayment. We conclude that the loan amount was $1,249,149, rather than what respondent determined.

Petitioners argue that whatever loans Mr. Warmoth took carried market interest rates. Petitioners point to no credible evidence in the record showing that Mr. Warmoth actually paid interest or that Weekend Warrior accrued and/or recorded interest on the receivable. It is unclear which journal postings record Mr. Warmoth's payments of interest. Petitioners similarly failed to explain any of Mr. Warmoth's bank statements that could show loan interest payments.[41] We therefore sustain respondent's

---

[41]Petitioners introduced into evidence voluminous financial documents yet failed to identify the relevant pages in those documents that petitioners wanted the Court to consider. These documents included: The 149-page Weekend Warrior General Ledger for the period Jan. 1 through June 30, 2004; the 313-page Weekend Warrior General Ledger for the period July 1 through Dec. 31, 2004; 78 pages of Weekend Warrior's bank statements for the Comerica account for the periods May 1 through June 30, 2004, and Aug. 1 through Dec. 31, 2004; 275 pages of bank statements for Weekend Warrior's Foothill account ending in No. 6138 for the period from Jan. 31, 2003, through Dec. 31, 2004; 24 pages of Weekend Warrior's statements for Foothill account ending in 1527 for the period Mar. 31, 2000, through Dec. 31, 2004; 144 pages of Weekend Warrior's statements for Foothill account ending in 1519

(continued...)

determination that the loan, in the amount stated above, was a below-market loan.

## VI.  Section 6662(a) Penalties

In the notices of deficiency issued to Mr. Warmoth respondent determined that Mr. Warmoth's underpayment was attributable to (1) negligence or disregard of rules or regulations under section 6662(b)(1); (2) substantial understatement of income tax under section 6662(b)(2); or (3) substantial valuation misstatement under section 6662(a), (b)(3), and (h).

With respect to Weekend Warrior's underpayment for 2002, on brief respondent changed his position regarding the applicable component of the section 6662(a) penalty.  In the notice of deficiency issued to Weekend Warrior respondent calculated the amount of the penalty using the 40-percent rate that generally applies to gross valuation misstatements.  See sec. 6662(a), (h). The form titled "Accuracy-Related Penalties Under IRC 6662" that respondent attached to Weekend Warrior's notice of deficiency explains these calculations citing section 6662(h) and using the 40-percent rate with respect to the total amount of deficiency. Yet another attachment to the notice of deficiency titled

---

[41](...continued) for the period Jan. 1, 2003, through Dec. 31, 2004; and 79 pages of Mr. Warmoth's statements for his Wells Fargo Bank account for the period from Apr. 22, 2002, through Feb. 23, 2005.

"200212--Adjustments Subject to Accuracy-Related Penalty--IRC 6662" indicates that only the underpayment resulting from the adjustment to the management fee deduction is attributable to the 40-percent gross valuation misstatement penalty, and the remaining underpayment is attributable to negligence or disregard of rules or regulations.  Respondent's amendment to answer contains similar inconsistencies, but respondent again calculates the amount of the penalty using the 40-percent rate of the gross valuation misstatement penalty for the whole underpayment.

On brief, however, respondent does not argue that the gross or substantial valuation misstatement penalty under section 6662(a), (b)(3), and (h) applies.  Instead, respondent asserts that Weekend Warrior's underpayment is attributable to negligence or disregard of rules or regulations or substantial understatement of income tax under section 6662(a) and (b)(1) and (2).  We construe respondent's position on brief as an abandonment of his prior position regarding the 40-percent accuracy-related penalty.  We therefore must decide whether the underpayments of both petitioners are attributable to (1) negligence or disregard of rules or regulations under section 6662(a) and (b)(1) or (2) substantial understatement of income tax under section 6662(a) and (b)(2).

Generally, section 6662(a) and (b)(1) authorizes the Commissioner to impose a 20-percent penalty on the portion of an

underpayment of income tax attributable to negligence or disregard of rules or regulations. The term "negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, and the term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs. Disregard of rules or regulations is careless if "the taxpayer does not exercise reasonable diligence to determine the correctness of a return position" and is reckless if "the taxpayer makes little or no effort to determine whether a rule or regulation exists, under circumstances which demonstrate a substantial deviation from the standard of conduct that a reasonable person would observe." Sec. 1.6662-3(b)(2), Income Tax Regs.; see also Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Section 6662(a) and (b)(2) also authorizes the Commissioner to impose a 20-percent penalty if there is a substantial understatement of income tax. An "understatement" means the excess of the amount of the tax required to be shown on the return over the amount of the tax imposed which is shown on the return, reduced by any rebate. Sec. 6662(d)(2)(A). An understatement is substantial in the case of a corporation other than an S corporation when it exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Sec.

6662(d)(1)(A) and (B).  An understatement is substantial in the case of an individual if the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

The Commissioner bears the burden of production with respect to the taxpayer's liability for the section 6662(a) penalty and must produce sufficient evidence indicating that it is appropriate to impose the penalty.  See sec. 7491(c).  Once the Commissioner meets his burden of production, the taxpayer must come forward with persuasive evidence that the Commissioner's determination is incorrect or that the taxpayer had reasonable cause or substantial authority for the position.  See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

Respondent met his burden of production with respect to negligence as to both petitioners.  He introduced evidence that the management fee deductions did not satisfy the standard for deductions under section 162, that Weekend Warrior had forgone interest, that Mr. Warmoth had constructive dividend income, and that various other adjustments were appropriate.  Respondent also introduced evidence that the corporate structure created in 2002 resulted in improper unsupportable deductions.

Respondent also met his burden of production regarding the substantial understatement component of the penalty with respect

to Weekend Warrior.  Weekend Warrior reported no tax due for 2002, and its understatement exceeds both 10 percent of the tax amount required to be shown on the return and $10,000.

With respect to Mr. Warmoth, respondent met his burden of production regarding the substantial understatement component of the penalty for 2003 and 2004.  For 2003 and 2004 Mr. Warmoth reported $256,319 and $136,274 of tax due, respectively.  In the notices of deficiency respondent determined Mr. Warmoth had deficiencies of $1,252,944 and $471,615 for 2003 and 2004, respectively.  Respondent therefore met his burden of production under section 7491(c) for 2003 and 2004.  However, respondent did not meet his burden of production regarding the substantial understatement component of the penalty for 2002.  Mr. Warmoth reported total tax of $158,779, and in the notice of deficiency respondent determined a deficiency of $14,836.  Mr. Warmoth's understatement does not exceed the greater of 10 percent of the amount required to be shown on the return or $5,000.

By reason of the above, petitioners had the burden of producing sufficient evidence to prove that respondent's penalty determinations, except the determination that Mr. Warmoth is liable for the accuracy-related penalty for 2002 on the basis of a substantial understatement of income tax, are incorrect.  See Higbee v. Commissioner, supra at 446-447.  Petitioners did not do so.

Petitioners presented no argument or credible evidence on the substantial understatement component, nor do petitioners argue that they were not negligent. Instead, petitioners contend that they should not be liable for the accuracy-related penalties on the ground of the reasonable cause and good-faith defense under section 6664(c)(1). Petitioners contend that they sought professional tax advice in connection with the structuring of the businesses and the preparation of the Federal income tax returns. Petitioners state that they had a team of competent professional advisers on whom they relied heavily and in good faith.

Generally, section 6664(c)(1) provides an exception to the section 6662(a) accuracy-related penalty with respect to any portion of an underpayment if the taxpayer shows that there was reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. The determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. The most important factor is the extent of the taxpayer's effort to assess the proper tax liability. Id. For the reasonable cause exception to apply, the taxpayer must prove that it exercised ordinary business care and prudence as to the disputed item. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 98 (2000), affd. 299 F.3d 221 (3d Cir. 2002). The taxpayer bears the burden of proving that it

meets the requirements for relief under the section 6664(c)(1) reasonable cause exception.  See Higbee v. Commissioner, supra at 446-447.  We determine reasonable cause and good faith on a case-by-case basis, taking into account all pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess his proper tax liability.  Id.

Reliance upon the advice of a tax professional may establish reasonable cause and good faith.  See United States v. Boyle, 469 U.S. 241, 250 (1985).  Reliance on a tax professional is not an "absolute defense" but merely "a factor to be considered." Freytag v. Commissioner, 89 T.C. 849, 888 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991).  Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all of the facts and circumstances.  See Neonatology Associates, P.A. v. Commissioner, supra at 98.  The taxpayer claiming reliance on a tax professional must prove by a preponderance of evidence each of the following:  "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment."  Id. at 99.  Reliance on a return preparer is not reasonable where even a

cursory review of the return would reveal inaccurate entries. See, e.g., <u>Pratt v. Commissioner</u>, T.C. Memo. 2002-279.

The record is replete with broad references that the team of advisers provided "general" tax advice and "general" information about, for example, S corporation taxation. For example, Mr. Warmoth testified that Mr. Mitchellweiler, Crabtree & Associates, and Mr. Lindsey advised Mr. Warmoth that the transactions separately and as a whole complied with Federal income tax laws. Mr. Mitchellweiler provided tax advice as to the consequences of forming an S corporation, although not specifically with respect to tax compliance issues. Crabtree & Associates advised that the transaction complied with the applicable Federal income tax law. Mr. Lindsey also provided general tax advice regarding the transaction. No opinion letter, however, was prepared with regard to the transaction between Weekend Warrior and Leading Edge, ostensibly because the team believed the transaction was not aggressive.

The record establishes that Crabtree & Associates prepared the returns for each petitioner for 2002 and 2003 and that Curzon, Cumbey & Kunkel, PLLC, prepared petitioners' 2004 returns. The testimony about what general advice was provided to petitioners does not establish that petitioners meet the elements for relief from the penalties. The record contains no credible evidence regarding the return preparation process or the

background of the tax professionals who prepared the returns that would justify reliance on them. In addition, we base our conclusion regarding the management fees on the lack of credible evidence in the record establishing that the fees were reasonable or necessary.

With respect to the airplane and boat depreciation and airplane-related deductions, the parties stipulated that Weekend Warrior did not maintain travel logs. Weekend Warrior therefore did not provide all relevant information to the tax adviser for reporting those expenses.

Petitioners have failed to carry their burden of proving that there was reasonable cause for, and that they acted in good faith with respect to, any portion of the underpayment in tax for each year at issue. We sustain respondent's determinations of the accuracy-related penalties.

We have considered the remaining arguments made by the parties, and to the extent not discussed above, we conclude those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.